CASE 48—INDICTMENT OF JAMES HOWARD FOR THE MURDER OF WILLIAM GOEBEL—MARCH 28.

# Howard v. Commonwealth.

### APPEAL FROM FRANKLIN CIRCUIT COURT.

DEFENDANT CONVICTED OF MURDER AND APPEALS.  REVERSED.

INDICTMENT—AIDERS AND ABETTORS—FAILURE TO DISCLOSE ACTUAL PERPETRATOR—ACCOMPLICES—INSTRUCTION AS TO CORROBORATION—DECLARATIONS OF CO-DEFENDANTS AS EVIDENCE—CROSS EXAMINATION OF ACCUSED AS TO OTHER OFFENSES—MISCONDUCT OF COUNSEL IN ARGUMENT—REVERSIBLE ERRORS.

1. Under Criminal Code Practice, section 126, authorizing an averment in the alternative as to the different modes and means by which the offense charged may have been committed, an indictment for murder, which charges that one of the several defendants named therein, or some person acting with them, whose name is unknown to the grand jury, fired the shot, and that the other defendants were present, aiding and abetting the shooting, but that which one fired the shot and which aided and abetted the shooting is unknown to the grand jury, is good.

2. Under such an indictment it was proper to instruct the jury that they might convict if they believed the defendant on trial fired the shot, or if they believed that one of the other defendants fired the shot, and that he was acting with them, or any one of them, and did aid and abet such shooting.

3. There can be no conviction upon the testimony of accomplices alone, however many there may be, and therefore, where two accomplices testified, an instruction telling the jury that they could not convict upon the uncorroborated testimony of "an accomplice" was erroneous, in that it failed to present the idea that one accomplice can not corroborate another for the purpose of conviction.

4. On the trial of one of several defendants jointly indicted, the declarations of a co-defendant, made in the absence of the defendant on trial, in furtherance of the common purpose, is admissible when a *prima facie* case of conspiracy has been made out, though there be in the indictment no express averment of a conspiracy; but a defendant's guilt as principal or accessory can be finally established only by evidence of his own acts.

Howard v. Commonwealth.

5. The testimony of a witness for defendant on cross-examination as to an altercation had by him with one of the witnesses for the Commonwealth on a train, was admissible to show the feelings of the witness.

6. Upon a trial for murder, defendant, testifying for himself, was privileged from answering questions asked him on cross-examination as to another murder with which he was charged.

7. It was error to permit a witness to testify that he heard T. say to defendant, "I want to compliment you on what you did in Frankfort," that being the place where the killing occurred, and that defendant "just nodded and passed on," there being no claim that T. had any connection with the homicide.

8. Where the regular Commonwealth's attorney took no part in the prosecution because of his sickness, it was prejudicial error to permit the Commonwealth's attorney *pro tem.* to say to the jury in his closing argument that he was commissioned by the regular Commonwealth's attorney to say to them "that he thinks the defendant guilty, and hopes the jury will hang him higher than Haman."

9. Under Criminal Code Practice, section 281, the decision of the trial court upon the motion for new trial is not subject to exception.

CHIEF JUSTICE PAYNTER AND JUDGES HOBSON AND WHITE, DISSENTING IN PART.

W. C. OWENS, J. B. FINNELL AND CARLO LITTLE, FOR APPELLANT.

ROBT. J. BRECKINRIDGE, B. G. WILLIAMS AND T. C. CAMPBELL, FOR THE COMMONWEALTH.

(No briefs in the record.)

OPINION OF THE COURT BY JUDGE BURNAM—REVERSING, FOLLOWED BY DISSENTING OPINION OF JUDGES HOBSON AND WHITE, AND THE DISSENTING OPINION OF CHIEF JUSTICE PAYNTER.

The appellant, James Howard, was jointly indicted with Henry Youtsey, Berry Howard, Harlan Whitaker, and Richard Combs for the murder of William Goebel, and was, upon separate trial, found guilty of murder, and judgment was rendered in pursuance of the verdict. The indictment charges, viz.: "That the said Henry Youtsey, James Howard, Berry Howard, Harlan Whitaker, Richard Combs, and others then and there acting with them, but

who are to this grand jury unknown, in the county of Franklin, on the 30th day of January, 1900, and before the finding of this indictment, unlawfully, willfully, feloniously, of their malice aforethought and with intent to kill, did kill and murder William Goebel, by shooting and wounding him with a gun or pistol loaded with powder or other explosives, and lead and steel ball and other hard substances, and from which said shooting and wounding the said Goebel died on the 3d day of February, 1900; and the indictment does further charge that one of the above-named defendants, or another person then and there acting with them, but whose name is to this grand jury unknown, did so as aforesaid then and there kill and murder said Goebel, and the other of said defendants did then and there counsel, advise, assist, aid and abet same; but which so actually fired the shot, and which so actually counseled, aided, advised, and abetted therein, is to this grand jury unknown."

Appellant complains of the indictment because it charges him with being the principal, and at the same time of being the aider and abettor of the four other persons named therein, and of another person then and there acting with them, but who is to the grand jury unknown, in the commission of a crime which was the result of a single act, the firing of a single shot; and to support this contention we are referred, to the cases of Com. v. Patrick, 80 Ky., 605; 4 R., 660; Mulligan v. Com., 84 Ky., 230; 8 R., 211; 1 S. W., 417. In the Patrick case the offense charged in the indictment was that Amos and Wiley Patrick shot at and wounded Joseph Dyer with a pistol, and that each of them was present, and aided and encouraged the other to commit the offense. In that case the demurrer to the indictment was sustained upon the ground that the punishment im-

Howard v. Commonwealth.

posed by the statute was upon the person alone who act-
ually committed the act constituting the offense, and that
there was no provision in the statute for the punishment
of an aider and abettor; and that, as it was a purely stat-
utory offense, an indictment did not lie for aiding and abet-
ting therein, the aiding and abetting being a minor
offense, punishable only as a misdemeanor. In
the Mulligan case there was no question as to
the sufficiency of the indictment, but the question was
one of variance. The indictment was against Mulligan
alone, and charged him as the actual perpetrator of the
crime, and the court held that proof that he was only an
aider and abettor constituted a variance. When the court
said that the indictment must disclose the name
of the principal, it did not mean that there could
be no indictment if the name of the actual perpetrator of
the crime was unknown. The case adjudged was that proof
that the defendant aided and abetted the commission of the
felony will not support an indictment charging him as the
actual perpetrator of the crime, unless the actual per-
petrator is joined with him. In this case the indictment
charges that one of the defendants fired the shot, and that
the others were present, aiding and abetting, and that the
grand jury does not know which one fired the shot. This
is in effect an averment in the alternative as to the differ-
ent modes and the different means by which the offense
may have been committed as authorized by section 126
of the Criminal Code. That the actual perpetrator of a
criminal act and one present aiding and abetting him
may be jointly indicted in the alternative, one as the prin-
cipal and the other as the aider and abettor,
and that either, may be convicted as principal or as aider
and abettor, has been frequently held by this court. See
Benge v. Com., 92 Ky., 1 (17 S. W., 146); 13 R., 308; Travis

v. Com., 96 Ky., 77; 16 R., 253; (27 S. W., 863); Howard v. Com., 96 Ky., 19; 16 R., 201 (27 S. W., 854); Jackson v. Com., 100 Ky., 239; 18 R., 795 (38 S. W., 422). To say that one who is known to have been present aiding and abetting a murder can not be punished because the person who fired the shot is not known would, in large degree, destroy the efficacy of the law for the punishment of crime. Bishop in his New Criminal Law (section 495,) says, viz.: "A grand jury should not indict a man unless reasonably informed of his guilt; but the jurors may know it sufficiently while ignorant of an identifying circumstance such as ought ordinarily to appear in the allegation. Then they may state the main facts, adding that this circumstance is unknown to them, and the indictment will be good. Thus, if they are ignorant of identifying names, the allegation may be in this form; that is, the indictment, instead of saying what they are, may state that they are to them unknown." We are, therefore, of the opinion that the indictment comes up to the requirements of section 124 of the Criminal Code.

The next ground of complaint is that the instructions given by the court to the jury do not fairly and correctly state the law of the case. Only three instructions were given, and only two of them are complained of upon this appeal. The basis of appellant's objections to the first instruction are the same as those which are urged against the validity of the indictment itself. It, in effect, tells the jury that if they believe from the evidence, beyond a reasonable doubt, that the defendant willfully and maliciously shot the deceased with the intent to kill him, and from which shooting he afterwards died; or if they believe from the evidence, beyond a reasonable doubt, that either of the other defendants named in the indictment willfully and maliciously shot the deceased, and from which shooting he soon thereafter died; and they believe from

the evidence, beyond a reasonable doubt, that this defend-
ant was then and there acting with them, or any one of
them, and did then and there counsel, aid, and abet such
shooting,—they should find him guilty.  This instruction
has been frequently approved by this court in cases similar
to that on trial, and is a fair and clear statement of the
law.  The next instruction complained of is as follows:
"The defendant can not be convicted upon the testimony
of an accomplice, unless such testimony is corroborated
by other evidence tending to connect the defendant with
the offense; and such corroboration is not sufficient if
.it merely proves the commission of the offense, and the cir-
cumstances thereof."  This instruction is substantially in
the language of section 241 of the Criminal Code, and in
cases where only one accomplice was introduced by the
Commonwealth would be a sufficient compliance with the
Code; but in this case the Commonwealth introduced as
witnesses two persons who had been previously indicted as
accessories before the fact to the murder of the deceased,
and it complained that the instruction is erroneous and
misleading because it fails to tell the jury that the testi-
mony of one accomplice or accessory before the fact can
not be used to corroborate the testimony of the other for
the purpose of convicting the defendant.  The rule as to
the corroboration of accomplices is stated in Rosc. Cr. Ev.
122, as follows:  "There should be some fact deposed to
independently altogether of the evidence of the accom-
plice, which, taken by itself, leads to the inference not only
that a crime has been committed, but that the prisoner is
implicated in it."  Russ. Crimes, 962, says that, viz.:  "It
is not sufficient to corroborate an accomplice as to the facts
of the case in general, but that he must be corroborated
as to some material fact or facts which go to prove that

the person was connected with the crime." The degree of evidence which shall be deemed sufficient to corroborate the testimony of an accomplice is a matter for the jury; but there must be some fact deposed to independently altogether of the evidence of an accomplice, whether one or a dozen is introduced by the Commonwealth, which, taken by itself, fairly tends to connect the defendant with the commission of the crime, so that this conviction will not rest entirely upon the evidence of accomplices (see People v. Platt, 4 N. Y. Cr. R., 53; 3 Rice, Ev. p. 511, and authorities there cited); and this instruction is erroneous because it fails to present this idea.

We will next consider the claim of appellant that numerous errors to his prejudice were committed in the admission of incompetent testimony. As most of the objections to the testimony are based upon the same general rule of evidence, with a view to brevity we will consider a number of them together. First, it is claimed that, as there was no charge of a conspiracy in the indictment, it was error to allow numerous witnesses to prove the condition of the Statehouse yard on the morning of the 30th of January, the day on which deceased was shot, as compared with the five or six preceding days, with reference to the number of people therein; and also that the witness Culton was permitted to testify as to conversations had with Youtsey on the 12th and 13th of January, in which Youtsey detailed a plan to him for shooting the deceased from the office of the Secretary of State, and the manner in which it could be done, and how the perpetrator could escape through the basement of the building; and also as to conversations in which Youtsey talked to him about smokeless powder, etc.; and that the witness Golden was permitted to testify that John Powers gave to Youtsey a key to the office of the Secretary

Howard v. Commonwealth.

of State on the morning of the 30th day of January; and
that the witness Ricketts was permitted to testify as to
conversations had with Youtsey as to the killing of the de-
ceased several days previous to the 30th of January, and
also as to his conduct on the morning of the 30th in con-
ducting men from the agricultural to the executive build-
ing, and stationing them at the foot of the stair steps, and
as to directions given them by him; and to the testimony
of McDonald to the effect that he had seen Berry Howard
and Culton in conversation near the capitol building just
prior to the shooting; and the testimony of the witness
Day as to talks with Youtsey.  Of course, the testimony of
neither of these witnesses has any bearing upon the guilt
or innocence of the defendant, Howard, unless the Com-
monwealth, by other testimony, establishes a guilty connec-
tion between the defendant and Youtsey, and shows to the
satisfaction of the jury either that he fired the fatal shot,
or was present and aided and encouraged Youtsey or an-
other to do so.  The testimony in this case is altogether cir-
cumstantial and, as was said in the case of Obrien v. Com.,
89 Ky., 362; 11 R., 534 (12 S. W., 471);  'Necessarily, where the
proof of a crime can only be shown by proof of circum-
stances, the evidence should be allowed to take a wide
range; otherwise, the guilty would often go unpunished. It
is true that there must be some connection between the fact
to be proven and the circumstances offered in support of it,
yet any fact which is necessary to explain another, or which
offers a particular opportunity for the transaction which is
in issue, or shows facilities or motives for the commission
of the crime, may be proven. "And on the trial of one of
several defendants jointly indicted for an offense the decla-
ration of a co-defendant, made in the absence of the de-
fendant on trial, in furtherance of the common purpose,

is admissible when a *prima facie* case of conspiracy has been made out. To authorize the admission of such evidence, an express averment in the indictment of the fact of a conspiracy is not necessary. · See Goins v. State, 46 Ohio. St., 457, 21 N. E. 476. "But, to make the declaration competent, it must have been in furtherance of the prosecution of the common object, or constituted a part of the *res gestae* of some act done for that purpose." See Tayl. Ev. p. 542, section 530.

Mr. Archbold, in his work on Criminal Practice and Pleading (volume 2, p. 1059), gives a very concise, yet comprehensive, statement of the law. He says, viz.: "Wherever the writings or words of any of the parties charged with or implicated in a conspiracy can be considered in the nature of an act done in the furtherance of the common design, they are admissible in evidence against not only the party himself, but as proof of an act from which, *inter alia*, the jury may infer the conspiracy itself. But wherever the writings or words of such a party, not being in the nature of an act done in furtherance of the common design, merely tends to implicate others, and not the accused himself, they ought not to be received in evidence for any purpose." And this doctrine is approved in Wright, Cr. Consp. p. 217, and in Clawson v. State, 14 Ohio St., 234, and State v. Larkin, 49 N. H., 39. It seems to us that these declarations of Youtsey come within the rule laid down in these authorities, and are competent evidence to go to the jury. But it must not be forgotten that the defendant's guilt as principal or accessory can only be finally established by evidence of his own acts. See Wright, Cr. Consp., 69, 71; Steph. Dig. Cr. Law, article 39. And the testimony of B. P. White on cross-examination as to an altercation had by him with one

Howard v. Commonwealth.

of the witnesses for the Commonwealth on the train was competent to show the feelings of the witness, and the same may be said of the objections to the cross-examination of the witness Parker.

Upon the cross-examination of the defendant by an attorney for the Commonwealth he was asked the following questions, and was forced to answer them, over his objections: "Q. What was the offense charged against you for which these gentlemen were defending you? A. I have told you that. Q. Tell us now. A. It was for the murder —for the killing—of George Baker. I was charged with the killing of him. Q. Was he not an old man, with his hands up, and begging you for God's sake to spare his life? Further along in the cross-examination the same counsel asked the witness "If he did not from a window in the house of Beverly White, with the curtains drawn, in the town of Manchester, shoot Tom Baker, in the presence of his wife and infant children?" to which the defendant answered that he did not. He was then asked whether he was present when this was done, and where he was, and as to who had been indicted for the killing of Tom Baker. No exceptions were taken to these questions with reference to the killing of Tom Baker, and they would not be considered upon this appeal except for the fact that the court has concluded that the judgment must be reversed on other grounds, and a new trial had. The witness was privileged from answering these questions, not only because it was an attempt to impeach his testimony by proof of particular acts which had no connection with the offense for which he was being tried, but also because, if he answered in the affirmative, he would have subjected himself to prosecution for other offenses having no connection with that for which he was being tried.

In a long line of decisions this court has uniformly held questions of this character incompetent. In Sodusky v. McGee, 5 J. J. Marsh. 622, John Chowning, a witness for the appellee, having sworn to facts which occurred in the encounter between McGee and the appellants, was asked by their counsel "if he was not engaged at the time or shortly before the commencement of the encounter. some distance off, playing cards with a negro fellow."

In passing upon the competency of this question, Chief Justice Robertson said: "A witness should not be compelled to prove his own general character, nor should he be required to prove any special fact reflecting upon his character, unless it be pertinent to the issue, independent of its tendency to affect his character. His character could not be assailed by other witnesses by proof of particular facts, and certainly it would be improper to compel him to prove facts relating to his character which others would not be permitted to prove. But, if the fact itself be pertinent and legitimate, it is at least very questionable on principle, as well as authority, whether a witness, as a matter of course, would be excused from answering questions relating to it merely because they might in some degree tend to subject him to reproach, not infamy, or might tend to reflect upon his character some degree of disparagement. See Starkie, Ev., 137-139, 144. Anciently a witness might be compelled to answer questions which reflected infamy upon him (Peake. 129, 130); but this doctrine has been overruled by modern cases. See State Tr. 748; Starkie, 153; People v. Herrick, 13 Johns., 82. How far the tendency of a question to disparage a witness without rendering him infamous may entitle him to be excused from answering it has not, so far as we know, been settled by authority." The cases of Cole v. Wilson, 18 B. Mon., 214, and Pence v. Dozier, 7

Bush, 138 are to this effect.   And in discussing the ques-
tion in Saylor v. Com., 97 Ky., 190, (30 S. W., 390), the court
said through Judge Paynter:   "It is a rule that a witness
is not bound to answer any question which would tend to
subject him to punishment, presentment, or infamy.   Un-
der the bill of rights he can not be compelled to give evi-
dence against himself, but when he becomes a witness for
himself in a criminal prosecution, he waives that right so
far as the charge under investigation is concerned.   But
the fact that he does so waive it does not give the
Commonwealth the right to compel him to admit
the commission of other offenses which would subject him
to punishment, presentment, or infamy; for, if this were
done, it would be in utter disregard of the bill of rights,
and in many cases deter persons accused of offenses from
going on the stand as witnesses for themselves, as a forced
confession of another offense might subject to greater pun-
ishment than the charge under investigation."   In Leslie v.
Com. (Ky.), 42 S. W., 1095, (19 Ky. L. R., 1201),
it was held that it was prejudicial to the rights
of the accused, who was on trial for murder to
ask him upon cross-examination if he had not
been arrested for discharging firearms in a certain town,
and for carrying concealed weapons.   The court said: "This
question should only be admissible to show appellant's guilt
of particular acts, and therefore is within the inhibition
of section 597 of the Civil Code."   So, in Lewis v. Com.
(Ky.), 42 S. W., 1127, (19 Ky. L. R., 1139), the
court held that it was error prejudicial to the
substantial rights of the defendant to have asked
the clerk of the Bourbon Circuit Court if there was
not an indictment against a witness who testified for the
defendant charging her with being accessory to the murder
for which the defendant was being tried.   The court,

through Judge White, said: "This was error prejudicial to the substantial rights of the defendant, and was an attempt to impeach a witness by showing that she had been indicted as accessory to the crime of the murder of Amelia Lewis."

Witnesses can not be impeached by proof of particular acts or offenses that they might have been guilty of, but the inquiry must be confined to the general character, and not to the particular acts charged against the witness. It is evident that the testimony was introduced for the purpose of impeaching or weakening the testimony of the witness, and, we have no doubt, influenced the jury in considering her testimony." In Baker v. Com. (Ky.), 50 S. W., 54, (20 Ky. L. R., 1778), appellant was on trial for the murder of W. L. White. Upon cross-examination the Commonwealth was permitted, against the objection of the defendant, to prove by him that he was under indictment for house-burning, and also to ask him whether he had been indicted for anything else. This was held prejudicial error. In the very recent case of Pennington v. Com. (Ky.), 51 S. W., 818, (21 Ky. L. R., 542), in which the defendant was convicted of murder, and sentenced to the penitentiary for life, on the trial appellant was asked as to other indictment against him. The court, in an opinion by Judge Hazelrigg, held that "under section 597 of the Civil Code a witness could not be impeached by evidence of wrongful acts except in the manner pointed out, and that the evidence quoted was incompetent, and, from its nature, prejudicial."

And in the case of Ashcraft v. Com., 60 S. W., 931, (22 Ky. L. R., 1542), decided at this term of the court, it was unanimously held by this court that it was reversible error to ask the defendant on cross-examination as to other indictments against him

than that on which he was being tried. In discussing the question as to when a witness may refuse to answer, Greenl. Ev. (14th Ed.), section 454 says: "On this point there has been a great diversity of opinion, and the law remains still not perfectly settled by authorities. But the conflict of opinion may be somewhat reconciled by a distinction which has been very properly made between the cases where the question is not strictly relevant, but is collateral, and is asked under the latitude of cross-examination. In the former case there seems to be great absurdity in excluding the testimony of a witness merely because it will tend to degrade himself, when others have a direct interest in that testimony, and it is essential to the establishment of their rights of property, liberty, or even life, or to the course of public justice. Upon such a rule, one who has been convicted for an offense, when called as a witness against an accomplice, would be excused from testifying to any transactions in which he had participated with the accused, and thus the guilty might escape. And accordingly the better opinion seems to be that, where the transaction to which the witness is interrogated forms any part of the issue to be tried, the witness will be obliged to give the evidence, however strongly it may reflect on his character." Id. section 456: "It is, however, generally conceded that, where the answer which the witness may give will not directly and certainly show infamy, but will tend to disgrace him, he may be compelled to answer. When it does not, there seems to be no good reason why the witness should be privileged from answering a question touching upon his situation, employment, and associates, if they be of his own choice—as, for example, in what family he resides, what is his ordinary occupation, and whether he is intimately acquainted with or conversant with certain per-

sons, and the like; for, however these may tend to disgrace him, his position is of his own selection." And it is the general rule elsewhere. In the very able and well-considered opinion in the case of People v. Brown, 72 N. Y., 571, the court said: "I am of the opinion that the cross-examination of persons who are witnesses in their own behalf when on trial for criminal offenses should, in general, be limited to matters pertinent to the issue, or such as may be proved by other witnesses. I believe such a rule necessary to prevent a conviction for offenses by proof that the accused might have been guilty of others. Such a result can only be avoided practically by an observance of this rule." The court therefore erred in requiring the defendant to answer the questions.

The Commonwealth was also permitted, over the objection of the defendant, to prove by the witness Weaver that he heard Judge Tinsley say to the defendant: "Jim, I am glad to see you. I want to compliment you on what you did in Frankfort. I learned about you through my son"—and that the defendant did not open his mouth, but just nodded and passed on. There is no claim that Howard made any response to this remark, nor is there any claim that Judge Tinsley, who is one of the circuit judges of the State, had any connection whatever with the homicide of which the defendant is accused; and, while the testimony is emphatically denied by Judge Tinsley, it was wholly illegal, and incompetent for any purpose, and should have been excluded.

Another ground of complaint is misconduct of the attorneys for the prosecution in course of the trial. It is especially complained that the Commonwealth's attorney *pro tempore*, in his closing argument to the jury, used these words: "I am commissioned by Robert Franklin to say to the jury that he is in thoro·· ·· ·· accord and sympathy with

Howard v. Commonwealth.

the prosecution, and that he thinks the defendant guilty, and hopes the jury will hang him higher than Haman." It appears that Robert Franklin, the regular Commonwealth's attorney, did not participate in the prosecution of the accused because of sickness, and that his place was supplied by the appointment of the *pro tempore* attorney who used the language complained of. Mr. Franklin was not a witness in this case, and, if he had been, he would not have been permitted to have expressed an opinion of the guilt or innocence of the accused; and his opinions on that subject, whatever they may have been, were wholly irrelevant and incompetent; and the facts that he occupied a high official position, that he was prevented by sickness from the discharge of the duties imposed upon him by law in connection with the prosecution, undoubtedly gave to this message, communicated to the jury by his substitute in his closing address, undue weight, and was, under the circumstances, very prejudicial to the rights of the defendant. And it is a well-established rule that it is error sufficient to reverse a judgment for the court to suffer counsel against the objection of the defendant, to state facts not in the evidence or pertinent to the issue, and the evidence of which would have been ruled out. See 2 Enc. Pl. & Prac. p. 727; Kennedy v. Com., 77 Ky., 360.

One of the grounds relied on in the motion for a new trial made in the court below is that the court erred to the prejudice of the accused in refusing to sustain his motion to fill up the jury box by persons whose names were drawn from the jury wheel, instead of directing the sheriff to summon a special venire after the original panel of jurors had been exhausted. This motion was supplemented by the affidavits of quite a number of persons, who stated, in substance, that four of the jury who tried the defendant had formed and expressed the opinion that he was guilty before they

were accepted on the panel; and that this information was not communicated to the defendant until after the termination of the trial.   While all of the statements contained in these affidavits are denied by the accused jurors, and may have no just foundation, yet the fact that so many persons could be found to make affidavits so circumstantial in their detail of facts on this point illustrates the great importance, in a case of this character, of using every precaution to secure discreet and impartial citizens to act as jurors.   Under section 281 of the Criminal Code, the decision of the trial court upon the motion for a new trial is not subject to exceptions, and consequently it will be unnecessary for us to further consider this question.

Numerous other errors are complained of, but, as they are not likely to occur again, are not considered in this opinion.   But, for error pointed out and discussed, the judgment of the trial court is reversed, and the case remanded for a new trial consistent with this opinion.

Judge Hobson's opinion.

Judge White and I concur in the opinion of the court in the reversal of the judgment in this case on the ground that the particulars of the shooting of Baker by appellant should not have been admitted in evidence, and that, as the record stands, the statement of the attorney for the State in his closing speech set out in the opinion was peculiarly prejudicial.   Appellant can not be convicted in this case because he may have committed another crime of like character; and proof that he had done so, or even such an impression, might seriously prejudice him before the jury, who might consider that such proof showed he was the character of person who would commit such a deed as that charged herein.   Appellant is also entitled to

Howard v. Commonwealth.

be tried by the jury under the law and the evidence, and
nothing could be more damaging to him than for the jury
to get the impression that public sentiment was to the ef-
fect that he was guilty, and ought to be hung.  We also
concur in the opinion of the court that the evidence as to
the statement of Judge Tinsley to the appellant should not
have been admitted, and that the instruction as to the tes-
timony of an accomplice should have used the word "accom-
plices," instead of the words "an accomplice."  But, under
the facts of the case, we do not see that appellant was seri-
ously prejudiced by either of these two matters.  We do
not concur in that part of the opinion which undertakes to
lay down the proper limits of cross-examination, and see
no reason for discarding the settled practice in this State,
supported by a number of decisions of this court, to follow
the dictum of a New York judge announcing a rule that is
not followed in that State, and is contrary to the great
weight of modern authority.  We therefore dissent from
that part of the opinion.  The chief justice also concurs
with us on this point.

Chief Justice Paynter (concurring in result).

Two things are as certainly established by the evidence
in this case as it is possible to establish anything by hu-
man testimony.  One is that William Goebel was assassin-
ated while peaceably passing through the State-house
grounds to discharge his duties as a member of the Ken-
tucky Senate; the other that the assassin fired the fatal
shot from a window in the private office of Caleb Powers,
the Secretary of State.  Under the indictment, and under
the well-established rules of practice in this State, James
Howard could have been found guilty of murder if the
proof showed that he either fired the fatal shot, or aided

and abetted another in doing so. · So the jury was author-
ized to find him guilty of murder if the evidence warranted
it in reaching the conclusion that he was the principal or
an aider and abettor.   The indictment charges that the ap-
pellant, James Howard, Henry Youtsey, and others were
guilty of the offense.   If the testimony showed that Yout-
sey fired the shot, and the appellant, Howard, was present,
aiding and abetting, he was guilty; if it showed that the
appellant, Howard, fired the shot, and Youtsey was pres-
ent, aiding and abetting, he was guilty.   Then any testi-
mony which conduces to show either of them to be a prin-
cipal or an aider and abettor was competent.   For the pur-
pose of considering the questions which I will discuss it is
necessary to briefly state some of the evidence offered con-
ducing to show the guilt of the parties.   In doing so I will
briefly call attention to some of the testimony against
Youtsey and the appellant Howard.   William Goebel, then
a senator, but afterwards declared governor by the Legis-
lature, was shot at about 11:15 a. m. on January 30, 1900.
The evidence introduced by the appellant, Howard, con-
duces to prove that he left his home (Manchester, Ky.), on
the morning of the 28th of January, 1900, and rode to Lon-
don, Ky., arriving there at about 2 o'clock in the afternoon.
He remained there during the night, and the next morning
went to Winchester, · Ky., from which place he came to
Frankfort, arriving at 10:17 a. m., about one hour before
the assassination.   The accused claims that he did not go
to the State-house square until the afternoon on the day
of his arrival; that upon his arrival he went to the Board
of Trade Hotel, and remained there a short time, walked to-
ward the State-house grounds, met a stranger by the name
of Robinson, and engaged him in conversation, and return-
ed with him to the Board of Trade Hotel, where he was at

Howard v. Commonwealth.

the time the fatal shot was fired, and where he remained until some time in the afternoon, when he went to the State-house. His defense is an alibi. He claims that he was notified by John G. White, of Winchester, to come to Frankfort with the view of obtaining a pardon for the killing of George Baker, for which offense he stood indicted. Ed Parker lives at London, Ky., and was on his bond in the case wherein he was indicted for the killing of Baker, and also one of his attorneys. He testified that Howard passed his office, while in London, on his trip to Frankfort, but did not stop to see him; and also that J. G. White had written to him before that time to do certain things to aid Howard in procuring a pardon, and that he had not done the things which White requested him to do. He also testified that he did not speak to Howard while in London, or endeavor to have an interview with him. I will add here that Howard says he thinks he talked to Parker in regard to the matter; but if he did not talk to him then, he did not advise either of his attorneys of his purpose to come to Frankfort to get a pardon, or ask their aid in the matter. John Ricketts testified that he was in the agricultural office on the day before the assassination, and was in conversation with Youtsey as to the contest that was then pending before the Legislature for the office of Governor, wherein William Goebel was contestant and W. S. Taylor contestee, and Youtsey said: "The way to settle it was to put Goebel out of the way, and that he had $100 of his own money to have it done, and he thought there were ten or eleven others that wanted it done as much as he did; and he thought it could be done from the executive building, and the man who did it escape through the basement." He also testified that fifteen or twenty minutes before the shooting Youtsey rushed into the agricultural building, and

said for some of them to come with him; that he, together with others, went to the executive building, and Youtsey stationed them at the foot of the stairway on the inside of the building, and told them that something was going to happen, and for them to stand there, that there would be a man come down among them, and for them to scatter off together; that the witness realized something was going to happen, and left the men standing at that place, and left the building.

It also appears that the stairway where the men were stationed was near the door leading into the private office of the Secretary of State from the hallway. It is proven by Lewis Smith, who knew Youtsey well, that immediately after the shooting he (Youtsey) ran down the stairway which leads to the basement from a point near a door in the Secretary of State's office; that he went on through the basement. It is proved by Ed. Thompson, Jr., that shortly thereafter Youtsey was seen to enter the executive building from the Lewis street entrance. It is proven by Walter. Day that some days before the assassination Youtsey told him that, if he could get $300, he could settle the contest. W. H. Culton testified that some time before the assassination he saw Youtsey with a box of cartridges in his hand; that he told him he had a scheme by which he thought he could kill Goebel, and showed him a cartridge, and said he thought it would be the thing to do it with; that he had a key to the Secretary of State's office; that he could get in whenever he wanted to; that he had examined a window in that office, and that he could be killed from that window, and no one would know anything about it; that he could pull the blind down a certain distance, fire the shot, and get out through the basement; and said that he had smoke-

less cartridges that fired steel balls, and opened a box and showed them.

The window blinds in the private office of the Secretary of State were discovered to be down immediately after the shot was fired. Wharton Golden testified that he, John, and Caleb Powers left for Louisville in the morning of the day of the assassination, and that John Powers, a brother of Caleb Powers, had given Youtsey a key to a door in the Secretary of State's office. Some of the testimony tending to establish the guilt of Howard is as follows: W. H. Culton testified that during the evening of the day of the assassination he met Jim Howard in the agricultural office, and, after greeting him, he said to Howard he was glad to see him, and asked him when he came, and he laughed, and said, "I have been here a week," and Culton said, "I have never seen you." He again laughed, and said, "I know that." Afterwards they were in the Secretary of State's office together, and Culton says while they were standing there Howard pulled out some cartridges in his hand, and said, "These are forty-five pistol cartridges," and then put them back, and pulled out another cartridge, and said, "That is a Winchester cartridge, a Winchester forty-five, and shoots smokeless powder." He asked him what he meant by it, and he said nothing. Witness further testified that Howard said "Goebel would die, but said, if there had been something or other on the cartridge, he would have died immediately—something of that kind—but said he would die anyhow." He also testified that Howard told him that he had been at the Capital Hotel, where Goebel was carried after he was shot, and in speaking of Goebel he said, "Damn him, he will die anyhow." The witness also testified that Howard pointed to the tree, and said: " 'Some guys didn't understand;' but, he said, 'Do you see

that tree? If you want to make a dead shot at a moving
object, take a sight on that tree, and when the object pass-
es by you will make a dead shot every time.' " This latter
statement is important, as the body of the deceased, at the
time the shot was fired, was in line with a hackberry tree
viewed from the windows in the office of the Secretary of
State. The witness also testified that Howard said, "He
had always heard Jack Chinn was considered a brave man,
but you ought to have seen that son of a b—— run when
that shot was fired out there;" whereupon the witness
asked him how he knew. and Howard replied, "Don't ask
me any fool questions."

Jack Chinn was with Goebel when he was shot. Whar-
ton Golden testified that on the morning of the 31st of
January, 1900, he had a conversation with Jim Howard in
regard to Jack Chinn, in which Howard said, "I understand
Jack Chinn is a great race horse starter, but he never
started a horse that could run as fast as he can;" where-
upon Golden asked him how he knew, and Howard replied,
"I ought to know; he was with Goebel." He also testified
that on the same morning Howard expressed a desire to
join the military company of which John Powers was cap-
tain. John Powers agreed to it, and said for Howard to
get some blankets, but Caleb Powers advised them not "to
take Jim into the company." James S. Stubblefield was
deputy assessor of Clay county under Howard, and some
two or three days before Howard left for Frankfort he had
a conversation with him, in which he said: "Jim, I believe
I will write down and get Governor Taylor to give me a
captain's place to get up a company here, and take a num-
ber of men down there to fight. Jim said, 'You can't fight;
you can't stand up;' and said, 'I am attending to that. I
am getting letters every once and a while from Taylor, and

I will attend to that.'" He testified that on Howard's re-
turn from Frankfort he came to his house one night to
get the witness' son to take a horse to London. During
the time he was there witness remarked to him that: "You
have had a batch of fun at Frankfort," and he said, "Yes,
we have had hell, and cleaned up the patch." Witness
then said, "Jim, what do you mean by cleaning up the
patch?" He said, "You know whenever I look through the
sights of my pistol or gun I always get meat or money—
one; and, by God, this time I have got both."

Witness testified that he had a subsequent conversation
with Howard, and gives it as follows: "'Jim, I have been
studying about the conversation we had the other night.
Do you mean to say you killed Goebel?' He said: 'By
God! I mean just what I said.' I said then: 'Jim, you
ought not to talk so much. You will get yourself in trou-
ble.' He said: 'By God! my friends won't go back on me,
and, if they want me, let them come and get me. By God!
five hundred men can't take me out of this town.'"

Robert Allen testified that he had a conversation with
Howard in regard to the assassination of Goebel, in which
Howard said, "I know the identical man that did it, and
thank the God above for it." Afterwards Howard came to
this witness, and wanted to explain the previous conversa-
tion which they had had, and said that he meant to say that
he knew who had indicted him, and he thanked the God
above for it. This explanation seems to have been made
from the fact that some one who was present when he had
the first conversation had suggested that he ought not to
have said what he did to the witness. John L. Jones was
introduced as a witness, who testified that on the morning
after the shooting of Goebel Jim Howard came to where
he was cooking breakfast, and attracted his attention by

giving him a slap on the back, and in the conversation the witness told him there was nothing in the shooting of Goebel, and he replied there was—"that he was shot by a damned dead shot." The witness testified that after the death of Goebel he had another conversation with Howard, in which he said, "Didn't I tell you he was shot by a dead shot?" and further said that "whenever he shot he shot to kill."

C. T. Jones, son of John L. Jones, testified that Howard said to him, in response to a suggestion that Goebel was not shot, "Yes, he was, and he was shot a deadener." James F. Dailey, Charles Howard and R. O. Armstrong testified that a few minutes after the shooting Jim Howard and some other men stood on the steps of the executive building (some of whom had guns in their hands) for the purpose of preventing any one from entering that building. Dailey, Howard, and Armstrong recognized the defendant, Howard, as being one of the men standing on the steps at the time stated. E. T. Lillard, Jr., testified to the similarity in the appearance of the defendant, Howard, and one of the men whom he had seen on the steps of the executive building; that the man he had taken to be Jim Howard was a man with a cast in one of his eyes, but it did not appear so marked at the time he testified as on the day he saw him on the steps. Bowman Gaines and Ben Rake testified that shortly after the shooting they saw a man jump over the fence back of the executive building into Clinton street, and go down that street; that they recognized the defendant, Howard, as being the man whom they had seen. These witnesses all testified that he had a dark or brown stubby mustache at that time.

The defendant did not offer any witnesses who said they were present at the time Dailey and others testified that the

defendant, Howard, was on the steps of the executive build-
ing.  This testimony is sought to be impeached by the tes-
timony of two witnesses who say that Howard was in the
office of the Board of Trade Hotel when the shot was fired,
and also by the testimony of some of Howard's acquaint-
ances, to the effect that he had not been wearing a mus-
tache for some time before he came to Frankfort.  The
testimony of these witnesses that Howard had not been
wearing a mustache may be substantially true, and still
the jury may not have concluded that it impeached the tes-
timony of the witnesses offered by the Commonwealth to
show that he was at the executive building at the time of
the shooting.  It may have been inferred by the jury that
a few days' growth of beard gave him the appearance of
having a short, stubby mustache at the time the witnesses
for the Commonwealth claimed to have seen him on the
steps of the executive building.  One witness for the Com-
monwealth testified that on the night following the shoot-
ing he saw the accused, Howard, and he had the appear-
ance of having been freshly shaved.  The Commonwealth
introduced two or three witnesses, who testified that nei-
ther Howard nor his alibi witnesses were in the office of
the Board of Trade Hotel at the time the shot was fired.
The jury might have reasonably concluded that the evi-
dence offered to establish the alibi was completely destroy-
ed by the evidence of the Commonwealth.  The jury had
the right to draw any reasonable inference that could have
been drawn from the statement which Howard made that
"he remained away from the State house until late in the
afternoon on the day of the shooting.  The jury may have
regarded the statement as being discredited from the fact
that Howard had reason to believe he had friends at the
State house, and naturally would have gone there on that

account, and also in regard to the business which he claims brought him to Frankfort. The jury may have attached some importance to the fact that Caleb Powers objected to him joining John L. Powers' company on the morning after the assassination. It is claimed that the testimony of John L. Jones is not worthy of credit, because he had been in the penitentiary on two occasions for manslaughter, and that he had been looking up testimony for the prosecution on promise that he would be paid for his services. It is claimed that Stubblefield's testimony was impeached by proof of bad character, and by proof that he had made statements inconsistent with those made upon the witness stand. Stubblefield had been a school teacher, deputy sheriff, and deputy county assessor under the accused, Howard. He states the circumstances under which he disclosed the statements which he claims Howard made to him. He went to Cincinnati, and it was reported in Clay county that he was making statements showing Howard's connection with the killing of Goebel. At this Howard's friends became incensed, and the witness was advised to leave the county, or he would be killed. After this he says he concluded to tell what Howard stated to him, but says he had not done so previous to that time. His own testimony shows that he did not condemn Howard for killing Goebel, if he did it, but, on the contrary, at the time of the conversation and afterwards, would have protected him, if possible, from prosecution therefor. Jones and Stubblefield are the kind of men to whom one might suppose Howard would give his confidence if he had killed Goebel. He never would have made such an admission to a man in his neighborhood who abhorred murder, and believed that murderers should be punished. The jury that tried Howard would not have subjected itself to the charge of faulty rea-

Howard v. Commonwealth.

soning if it had concluded that Jones and Stubblefield were not first-class citizens, but were the kind of men that Howard would have naturally selected for the purpose of imparting the fact that he had killed Goebel.

I have called attention to the leading facts of the case with the view of showing that an error slightly prejudicial to the defendant would not justify a reversal of this case, because the Code of Practice, which confers jurisdiction upon this court to review the action of the lower court in criminal cases, gives the court the power to determine from all the facts in the case whether the substantial rights of the accused have been prejudiced by the action of the lower court. On the examination in chief, the accused, Howard, desired to show the purpose for which he came to Frankfort, and to do so the following questions were propounded by his attorney, and the following answers were made: "Q. When were you here again? A. I came here on the 30th January. Q. Is there an indictment pending against you. A. Yes, sir; I am indicted in Clay county. Q. For what? A. For killing George Baker. . . . Q. What did you come down here on the 30th for? A. I came here to try to get a pardon. Q. For what? A. For the killing of George Baker." On cross-examination the witness was asked: "Q. Was not he an old man, unarmed, with his hands up, begging you for God's sake to spare his life? A. I could not say whether he was unarmed or begging. I do not remember very much about him." It is insisted that this question was an improper one, and the answer thereto was prejudicial to the defendant. For the purposes of what I will say with reference thereto, I will concede that it was an improper question; but whether it was prejudicial or not, in view of the facts developed in the record, is entirely a different question. The accused testified

that he was indicted in the Clay Circuit Court; that he came to Frankfort to get a pardon for "the killing of Baker." It will be observed that Howard testified that he had killed Baker; that he was indicted for it; that his plea was "emotional insanity." He did not claim that he had killed Baker in self-defense, but that he had done so when he was insane. On cross-examination of two or three witnesses by Howard's attorney the witnesses were made to state substantially that the accused had killed Baker. The jury had before them testimony that he had killed Baker, that he was indicted for it, that he had no defense except emotional insanity, and that he had applied to Governor Taylor for a pardon for the killing of Baker; thus calling the jury's attention to the fact that he was unwilling to be tried by a jury of his peers on the charge of killing Baker. Now, with all these facts before the jury, together with the facts that I have recited above, I do not think the answer which he made to the objectionable question prejudiced him in the mind of the jury. The answer was not an acknowledgment that he had killed Baker under the circumstance indicated by the question, for he said he could not remember very much about Baker, which answer is consistent with his plea of emotional insanity.

It is urged that the testimony of one W. D. Weaver, late superintendent of schools, in relation to what Judge Tinsley said to the accused, Howard, is incompetent and prejudicial. He testified in regard to Howard's return from Frankfort, and what took place in the court house at London. He said Howard came in, shook hands with some present, passed on to Judge Tinsley, and the judge said, "Good morning, Jim," reaching his hand, and he said, "I am glad to see you," and they greeted each other. The

Howard v. Commonwealth.

judge said, "Jim, I want to compliment you on what you did in Frankfort." Following the foregoing statement the witness was asked, "What did Jim Howard do?" He answered, "He nodded his head, and passed on. Howard did not open his mouth." From the testimony of Weaver Judge Tinsley did not mention anything which Howard had done at Frankfort. He simply said he heard of him through his son, who was a member of a military company at Frankfort. The employment of the word "compliment" would indicate that Tinsley desired to commend him for some act. If Howard had accommodated the son of Judge Tinsley while at Frankfort, he never would have thanked him by saying that he desired to compliment him for what he had done. There is nothing proven in this record to show that Howard did anything at Frankfort worthy of mention unless the testimony tends to connect him with the assassination of Goebel. It is true, the witness says that Howard 'said nothing, simply nodded his head. The nod did not indicate that he was adverse to receiving words of compliment from Judge Tinsley, but, on the contrary, it would imply that he was willing to accept the compliment which the judge gave him for what he did at Frankfort. It is but just to Judge Tinsley to say that he denies he used the language imputed to him by the witness, Weaver; but, in my opinion, the jury should be allowed to determine what, if any, weight should be given to this testimony. If Howard had failed to nod his head, then I would say that the testimony was incompetent.

While I think the instruction on the subject of the effect to be given the testimony of accomplices could have been somewhat improved by a little change in its phraseology, yet, for the reasons which are given in the dissenting opin-

ion this day delivered in the case of Powers v. Com.,110 Ky., 386 (22 R., 1807) (61 S. W., 735), I do not think it was misleading to the jury.

There is another question in the case that has given me some concern, and that is the objectionable remarks made by Mr. Williams, in his closing argument to the jury, with reference to the opinion of the Commonwealth's attorney, Mr. Franklin, as to the guilt of the accused, and the penalty which should be inflicted upon him. Whatever the opinion of the court may be, or my individual opinion as to the guilt of the accused, he is entitled to have a fair trial, and, as I can not determine with reasonable certainty as to what might have been the effect of the remarks on the mind of the jury, I do not dissent from the conclusion of the court that the defendant is entitled to a new trial.