## Newby v. Commonwealth.

(Decided Oct. 5, 1934.)

H. A. SCHOBERTH for appellant.

BAILEY P. WOOTTON, Attorney General, and **DAVID C.** WALLS, Assistant Attorney General, for appellee.

598

Hun Newby prosecutes this appeal from a four-year sentence given him upon conviction for the offense of having banded and confederated with others for the purpose of intimidating, disturbing, and injuring Douglas Roe.

It is forcibly contended that the evidence introduced by the commonwealth was altogether insufficient under the provisions sections 241 and 242 of the Criminal Code of Practice to sustain the jury's verdict finding him guilty of the offense charged, and therefore that the trial court erred in not giving a directed verdict for acquittal. In view of this being the nature of appellant's contention, it becomes needful to here give a brief summary of this evidence heard against the defendant and criticized as being wholly insufficient to incriminate him as a conspirator in the commission of the charged offense.

The facts in evidence, as shown by the record, are that on an afternoon in April, 1933, Herbert Marcum inquired of William Brack, in the city of Versailles, for some operator of a taxicab who would carry him out to the home of one Douglas Roe, who lived some seven miles out in the country. Brack recommended Wilmore Alexander, a local taxi driver, for the trip, and he was employed to take Marcum out to Roe's home. It appears that Marcum was well acquainted with the said Roe, and it is stated in brief that he was associated with Roe as a distributor for his "moonshine" products, Roe being a self-confessed bootlegger. Upon Marcum's finding Roe at his farm, they proceeded to load some 24 half-gallon jars of his "moonshine" into the taxicab, after which they, together with Mrs. Roe and a man named Fannin, proceeded to carry it some twelve miles away towards Versailles. They turned off the main road into Dry Ridge pike, up which they drove perhaps a mile to a private place, where they stopped and unloaded and hid the whisky in a field near the pike. Marcum then left Roe and the other members of the party there with the whisky, while he and the taxi driver, Alexander, drove back to Versailles. There is no evidence that the defendant, Hun Newby (here the appellant), had any advance information whatever of this, Marcum's first trip to Roe's, and of their bringing this moonshine whisky to this remote field, or that there was

any concert of action between him and Marcum as to it.

The next chapter in the story of Roe's having been injured and "hijacked" of his moonshine, for which Newby was convicted along with the others as for an offense committed pursuant to his having confederated with the colored men, William Brack, L. C. Mack, and Joe Henry Riley, and the white boy, Herbert Marcum, to so intimidate and injure Roe, begins with the said Newby's being seen talking with them on a street corner near a poolroom in Versailles, where, according to the evidence of Brack, Mack, and Riley, he told them that he knew of some whisky that was stored out near town on a named road and that he wanted Riley to drive his car out to the place and get it, and that his alleged accomplices Brack and Mack replied that they would like to go along, which they were permitted to do, and each buy a quart of it. It appears further that Newby, when speaking to Riley of wanting to send him out to the field for the whisky, first proposed to use his own car for the trip, but it then happening that a man named Wm. George Lewis, a local insurance agent of Versailles, drove up in his Ford, Newby asked him to lend him his car for a few minutes, to which Lewis consented but told him not to put any liquor in it. Having borrowed this car, Newby placed Riley at the wheel and told the two other negroes, Mack and Brack, to jump in the car and go for the whisky with him. Marcum was at the time, it appears, standing conveniently nearby at a church corner when they left, and he also got into the car at the next corner and went with them. The negro Mack carried a pistol along on the trip, which he kept on the seat by him. This whisky-minded crowd started, it appears, at about 5:30 p. m. for the field where Roe, his wife, and Fannin had earlier been left in custody of their hidden whisky. Arriving there, the negroes testify that Roe and all his waiting crew were drunk and that all the whisky they wanted was given them by Mrs. Roe, and therefore that there was no occasion for their buying any. Mrs. Roe denies this, testifying that it was given them by Marcum. However this may be, it is admitted that none of them bought any whisky of the Roes, but proceeded to load it into their car, as Marcum told them that they would carry Roe's whisky to Newby's place in Versailles, where they would divide what the negroes didn't want or that the rest would be sold either to or by Newby. After loading the whisky into the car,

Riley took the wheel, with Brack and perhaps also Mack standing on the running board, and started away, when it appears that Roe believed that he was being robbed of his whisky and ran and climbed upon the car to protest against their carrying it away, when he fell or was knocked off the car, in his fall catching his leg in the wheel and badly injuring it. Also it is in evidence that just before starting away with Roe's whisky, one of these negro hijackers asked him to change a $20 bill, when, upon Roe's producing his pocketbook—in which it appears he had some $8 or $10—to see if he could change it, the negro grabbed it and ran with it to the car, though it was there later recaptured by him. Also it appears that when Roe climbed onto the car, protesting and seeking recovery of his purse and whisky, Mack's pistol was brought into play and turned on him as he was knocked or shoved off by one of the negroes, when his leg was caught and held in the wheel brake, so as to drag and greatly pain him, causing him to holler out, at which he was told to get quiet or they would shoot him. The evidence does not show just what became of or was done with this 12 gallons of hijacked whisky more than that, after loading it into the car, it was carried away and lost to Roe.

A witness, Howard Jones, corroborates the testimony of George Lewis that he loaned Newby his car, stating that he was also present when Lewis loaned it to Newby and heard Lewis ask him not to put any whisky in it. Also the witness Alexander, the taxi driver, testifies that he was employed by Marcum to go to Roe's house and that there the Roes and others loaded the whisky into his car, when it was carried to the field for hiding, after which he carried Marcum back to town and also agreed to come back to the field for him in an hour, which he did, but did not see any one there though he thought he heard some one hollering as if in pain; that he did not know if Marcum saw Newby after returning to Versailles.

The witness Henry Bradley, not an accomplice, states that he saw Newby with the three negroes standing down on the church corner, where Marcum later joined them and got into the car, talking together at about 4:30 or 5 o'clock, and that he, later that evening, saw Hun Newby but didn't see him take any of the whisky.

Douglas Roe and his wife testify to Marcum's coming and getting the whisky and their carrying it over to the field where later the negroes with Marcum had come and taken it from him, but they do not even mention Newby as being involved nor in any way connected with the planning or perpetration of this injury done them, though some of the negro witnesses, convicted upon their separate trial of having banded themselves together to commit this offense, testify that upon their return to Versailles about 7 o'clock they found Newby standing upon the street, awaiting their coming, and that he directed them to return Lewis his car and took witness (Riley) home in his own car. This evidence would tend to show that Newby was expecting their return with this field whisky, but not that they had been sent by him to steal or hijack it.

The foregoing synopsis gives in substance all the evidence heard upon the trial tending to establish defendant's guilt of the offense with which charged.

Sections 241 and 242 of the Criminal Code of Practice read:

"Testimony of accomplice must be corroborated. A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely show that the offense was committed, and the circumstances thereof.

"Instructions to acquit if corroboration not sufficient. In all cases where, by law, two witnesses, or one witness with corroborating circumstances, are requisite, to warrant a conviction, if the requisition be not fulfilled, the court shall instruct the jury to render a verdict of acquittal, by which instruction they are bound."

Construing section 241 of the Criminal Code of Practice, the court has defined an "accomplice" as one of several equally concerned in the commission of a felony. Also it has held that a conviction cannot be had on the testimony of an accomplice unless corroborated by other evidence, and that the corroboration must extend to every fact necessary to establish the fact that the offense charged was committed, and that the

prisoner was the perpetrator. Howard v. Commonwealth, 110 Ky. 356, 61 S. W. 756, 22 Ky. Law Rep. 1845; Commonwealth v. Lee, 204 Ky. 575, 264 S. W. 1112.

The accomplice witnesses, Riley, Brack, and Mack, are now serving sentences in the penitentiary for conviction upon their trial of having committed the offense here charged of having confederated together to intimidate and injure Douglas Roe, as upon this occasion complained of. All testify that in taking "old man" Roe's whisky they were not acting in pursuance of a conspiracy had with Newby or with any one to steal from him or to injure him, but that Newby had only informed them that there was whisky hidden near Versailles, which they might buy and that he would furnish his car for them to go out and get the whisky and bring it in, buying such part of it as they wished. They testify that Newby borrowed Lewis' car, in which they were told to go for the whisky, but that his plan or understanding had with them was to buy, not steal, the whisky from Mr. Roe, nor did his plan or instructions given them contemplate or arrange for their hijacking the whisky from Roe or to in any wise injure him. While the evidence of these alleged accomplices and the other witnesses is to the effect that they were sent out to the nearby field where the whisky was hidden to bring it in, it is nowhere intimated or testified by any of them that Newby's plan for them was not to buy the whisky of Roe for him, or even that he was to get the whisky when they brought it in, except as is indicated by the testimony of Bradley, that Newby was waiting on the street for their return, and that of some of the accomplices' testimony that Marcum, also an accomplice, told them that the whisky which they didn't want to buy was to be carried to Newby's to be divided and the rest sold by or to him.

Newby was not here indicted for the offense of buying or transporting moonshine whisky, but rather on the separate and distinctly different offense of having confederated with these witnesses to intimidate and injure Roe. Their testimony, as well as that of the other witnesses, totally fails to connect the defendant with the commission of the offense of having confederated with them to injure or intimidate Roe, nor does the testimony of the other witnesses tend to show him guilty of the offense charged in the indictment. Not only is the evidence of the witnesses other than the accomplices

clearly insufficient to corroborate, as required by the provisions of the section of the Code quoted supra, but also even the evidence given by the accomplices themselves falls far short of showing that their taking of the whisky from Roe or their intimidating or injuring him upon this occasion was pursuant to any preconcerted plan had therefor with the appellant, or that he was a member of the band confederating to commit the offense charged. In Commonwealth v. Ellis, 133 Ky. 625, 118 S. W. 973, 976, it is said:

"The rule is elementary that, where a defendant is charged with being a conspirator, evidence must be first shown which, in the absence of contradictory evidence, would establish that he was a member of the band. This evidence may not be direct or positive in its nature, and it may be made up, as it usually is, of isolated or fragmentary facts and circumstances which, when placed together, establish the guilty connection. When this is done, the defendant is chargeable with legal responsibility for all the acts and declarations of his co-conspirators made during the existence of the conspiracy and in carrying it forward to its unlawful ends. But this is not the question here. Here it was sought to be shown that the defendant belonged to the band of conspirators, by hearsay declarations of the conspirators themselves. This evidence, as said before, is clearly incompetent, and the trial judge correctly excluded it. * * *

"It will be observed that the indictment charges the defendant with being guilty, with others, of a conspiracy to intimidate Mose Thornton. The charge goes no further than this. It is limited to this one act. Now it would be clearly erroneous to permit evidence of acts done by a band of men with whom the defendant is not even charged as being in concert or collusion. So far as the charge in the indictment is concerned, the object of the conspiracy was consummated in the intimidation of Mose Thornton. The evidence must be limited to establishing the charge made in the indictment. It can take no wider range than the indictment warrants. If the commonwealth chose to limit the range of the charge against the defendant to the conspiracy to intimidate Mose Thornton, the defendant had a right to believe, and to rely upon that belief, that

he would be required to meet only this charge, and to rebut evidence of the commonwealth against him tending to establish this charge."

And again in Day v. Commonwealth, 173 Ky. 269, 191 S. W. 105, 108, was it said:

"Where two or more are jointly indicted for the commission of a crime, although there is no express averment of a conspiracy having been formed between them to commit the crime, the acts and declarations of each may be proven against the others, *when a prima facie case of a conspiracy has been made out between them to commit the crime, if the declarations and acts are in furtherance of the common purpose,* although not done nor said in the presence of each other, but the court should instruct the jury in regard to them."

The entire evidence introduced by the commonwealth is thus equally consistent with the defendant's guilt in conspiring to do an entirely different unlawful thing, if in fact it points to any conspiracy entered into by him, from that of his having confederated with the defendants to commit the offense charged. The accomplices in testifying themselves deny that any such plan as charged of confederating for such an act was entered into by them with Newby. The proof having therefore failed to connect Newby with confederating to injure Roe, we are of the opinion that, to give due effect and consideration to the provisions of section 242 of the Criminal Code of Practice, the court upon this evidence, nonincriminating of Newby with the offense charged, should have instructed the jury to render a verdict acquitting the defendant. Even had the evidence for the commonwealth gone further and presented a state of fact which was equally consistent with defendant's guilt or innocence, the rule is that in such case the defendant would be entitled to an instruction to acquit.

In Meredith v. Commonwealth, 192 Ky. 378, 233 S. W. 792, 793, the court, speaking through Judge Settle, said:

"In a criminal prosecution to authorize conviction, the defendant's guilt of the offense charged must be established by the evidence beyond a reasonable doubt. Every fact essential to his conviction must

be shown by the evidence, and where, as in this case, the commonwealth's evidence presents two states of fact, under one of which the defendant is guilty, and under the other he is not guilty, and the evidence wholly fails to show which state of fact is true, he is entitled to an acquittal.''

The defendant here upon his trial entered a plea of not guilty, which put in issue every material fact charged in the indictment, when it became the duty of the commonwealth to prove beyond a reasonable doubt and in the manner required by law every material thing necessary to constitute defendant's guilt of having confederated with others to commit the particular offense charged in the indictment of intimidating and injuring Douglas Roe. Day v. Commonwealth, 195 Ky. 790, 243 S. W. 1051. Human life and liberty cannot be jeopardized or taken away except on testimony carrying conviction beyond a reasonable doubt of guilt of having committed the offense for which indicted and tried. Meyers v. Commonwealth, 194 Ky. 523, 240 S. W. 71.

The appellant should not be convicted on the mere suspicion that he confederated with the negroes and Marcum to intimidate and injure Roe, when there is no evidence, even given by the accomplices, to sustain the jury's verdict that he confederated with them to commit this offense. Taylor v. Commonwealth, 217 Ky. 278, 289 S. W. 285; Watkins v. Commonwealth, 227 Ky. 100, 12 S. W. (2d) 329; Fuson v. Commonwealth, 230 Ky. 761, 20 S. W. (2d) 742; Little v. Commonwealth, 210 Ky. 494, 276 S. W. 158. And to such effect is it held that the provision of section 238 of the Criminal Code of Practice, that ''if there be a reasonable doubt of the defendant being proven to be guilty, he is entitled to an acquittal,'' applies to criminal prosecutions against all classes of offenders. Sowder v. Commonwealth, 71 Ky. (8 Bush) 432.

We are therefore led to conclude, after a careful consideration and analysis of the commonwealth's evidence, as set forth above, that it is insufficient to corroborate the testimony of the accomplice witnesses as required by sections 241 and 242, supra, or at all so tends to establish the guilt of or connect Newby with the commission of the crime charged as to authorize a submission of the case upon such insufficient evidence to the jury.

We therefore conclude that the trial court erred in not sustaining appellant's motion for a directed verdict, for which reason the judgment is reversed.