## Sain v. Commonwealth.

(Decided December 13, 1921.)

### Appeal from Letcher Circuit Court.

1. Criminal Law—Declarations—Competency.—The declarations of one, jointly indicted for a crime, with another, not made in the presence or hearing of the other, are not competent evidence against the other, unless there is first shown by the evidence, that a conspiracy existed between them to commit the crime.

2. Homicide—Intimacy Between Accused and Wife of Deceased—Motive.—Where one is accused of murder, it is competent to prove that an improper intimacy existed between the accused and the wife of the deceased, to show a motive on the part of the accused to commit the murder, but such fact cannot be proven by the declarations of the wife, not made in the presence or hearing of the accused.

3. Homicide—Opinion of Witness—Discretion of Jury.—An improper intimacy between one accused of murder and the wife of deceased, cannot be proven by the opinion of a witness, but the facts must be shown and the jury left to determine, whether the facts prove such intimacy.

JOHN D. CARROLL, D. D. FIELDS and DAVID HAYS for appellant.

CHAS. I. DAWSON, Attorney General, and W. T. FOWLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HURT—Reversing.

The appellant, Frank H. Sain, was indicted jointly with Mrs. W. S. Crabtree for the murder of W. S. Crabtree. The indictment charged them with conspiracy to murder Crabtree, and that in pursuance of the conspiracy the appellant killed and murdered him, and his co-defendant aided and abetted him in so doing. Mrs. W. S. Crabtree was the wife of the victim of the homicide. Crabtree was a miner and lived in the town of Jenkins with his family, which consisted of his wife and a daughter, about ten years of age. The house in which he lived was built against a hill, and consisted of one room, with a porch in front, on the ground or the level space between the sidewalk and the hill, and three rooms upstairs consisting of a kitchen, dining room and bed room, one or more of the latter rooms resting upon the side of the hill. A small coal house stood at the back of the kitchen, and had a window about four feet from the ground which opened upon a roadway running behind the coal house. A plank walkway extended from the porch in front of the house, around it, between it and an adjoining house, passing up the hill beside the kitchen, from a porch in front of which steps descended to the walkway. Back of the house upon the hill, were other houses, in one of which Mrs. Sweeney lived. The appellant was an unmarried man, about twenty-four years of age, and for several months previous to the homicide, had been a boarder at the house of Crabtree, and occupied the lower room, or the one upon the level land, between the sidewalk and the hill, and out of which a door opened on to the porch in front of the house. A young man or boy named Stone, also boarded there, and a man named Williams had been a boarder there, along with appellant, but had been away for several months previous to the homicide, but still remained in the town and was a frequent visitor at the house. The relations between the appellant and Crabtree appeared to be friendly and cordial, until the Sunday upon which the homicide occurred, and which occurred at about 6:30 p. m. The deceased was drunk upon that day, and had been for two days previous thereto, and apparently was in an angry or perturbed state of mind. He and appellant and Williams drank beer together at about nine o'clock a. m., and shortly thereafter the appellant claims that he overheard a quarrel between the deceased and his wife, in which the deceased claimed that his wife had been out all night with some one, and ap-

pellant's name was called in the quarrel. The deceased threatened to go then and kill the offender and end the trouble. Appellant says that upon overhearing this quarrel, he left the house and went to that of Mrs. Sweeney, where there were several people of his age, and spent the day, taking dinner there, but two or three witnesses deposed to seeing him approach the window at the back of the coal house twice or three times on that afternoon, when Mrs. Crabtree would go down from the kitchen and into the coal house, and engage in a talk with him through the window, and at one time he handed a bottle through the window to her out of which she drank and returned it to him, and at another time she handed, through the window to him, an object that looked similar to a rolled up handkerchief, but appellant denies being at the coal house window or seeing Mrs. Crabtree at any time during the afternoon, and in this he is corroborated by young Sweeney, who deposes that appellant did not leave his mother's home during the afternoon. About six o'clock in the evening, the appellant claims that he went to the house of Crabtree, thinking that deceased would then be sober and that he could talk reasonably with him and explain away the cause of his animosity to him, and if he could not do so, he would take his effects and leave the house. The pistol, which he customarily carried, was at Mrs. Sweeney's, and he took that with him. He was seen to come from the direction of Mrs. Sweeney's, and when he came to the steps, in front of the kitchen, he ascended them and went into the kitchen for a minute or two, and then came out and descended the steps. He says that his reason for going into the kitchen was to ask Mrs. Crabtree and her daughter and sister, who were there, whether Stone and Williams were at the house. As he descended the steps, he was seen to take a pistol from the left side of his person and place it in his right trousers pocket. His excuse for this was that he had a crippled right hand, and he put the pistol upon his right side where he could conveniently reach it, in the event of necessity, and without any intention of using it upon any one. He walked around to the front of the house where deceased was sitting upon the porch, in front of the room which appellant had been occupying, and entered the room. The deceased entered the room after him, and within a minute or two a report of a revolver was heard in the room. Appellant came out with bare head and with a pistol in his hand, and went in the direc-

tion he came. When opposite the kitchen door, Mrs. Crabtree, her daughter and sister were there, and he and Mrs. Crabtree exchanged some words. He says that she inquired what had occurred and that he told her. He went into the kitchen and came out with a cap upon his head and disappeared, and was not seen in that community for three or four years, and not until after he had voluntarily surrendered himself to the police in California, and was returned to Letcher county. After the report of the pistol was heard, the persons who immediately went into the room found deceased upon the floor. A bullet had penetrated his body in front, at about the waistband of his trousers, and came out at his back. Although conscious, he never made any statement as to the circumstances of the shooting, and died during the night following. Appellant claims that when he entered the room deceased immediately followed him in and threatened to kill him, and when he asked the reason, the deceased said that appellant had been telling around that he was jealous of him. This appellant denied, but deceased insisted that it was true, and accompanied his threat by knocking the appellant down, and was bending over him as he lay upon the floor, and as he believed to do him further violence, when to protect his life, he shot the deceased through the body, and the bullet continued and struck the ceiling overhead. In these statements touching the circumstances of the difficulty, he is fully corroborated by Stone, the only person who claims to have been present.

The jury found him guilty of murder and fixed his punishment at life imprisonment. His motion for a new trial was overruled, and judgment rendered in accordance with the verdict, and he has appealed.

A reversal of the judgment is sought for three reasons.

(1). The court erred in permitting incompetent evidence to be introduced over objection, and to which rulings of the court, the appellant excepted at the time.

(2). The court misinstructed the jury as to the law of the case.

(3). The jury consisted of only nine men, the remaining jurors were women, who were permitted to be upon the jury, over his objection.

(a). Thomas Williams was permitted to testify that a short time before the killing he was at the house of Crabtree, and that Mrs. Crabtree handed him a note from the

appellant, in which the appellant requested him to come to where he was, and that in addition thereto Mrs. Crabtree told him to tell appellant not to come to the house, because deceased was very mad. The witness fails to show that the note was written by appellant, or was in his handwriting, or that he admitted having written it, or anything showing any connection of appellant with the authorship of the note, but he went immediately to where appellant was at Mrs. Sweeney's, and there had a conversation with him, but he does not relate that he delivered the message which Mrs. Crabtree sent to appellant. This evidence of what Mrs. Crabtree said, without proof that the message was delivered to the appellant, was clearly incompetent and the jury probably surmised from the fact that the witness advised the appellant that Crabtree was mad and not to come to the house, that he, also, delivered Mrs. Crabtree's message, and that the appellant, after having been warned by deceased's wife, went to the house in spite of the warning, and that in so doing he had a sinister motive, and was wrong in so doing.

(b). L. L. Plummer, a neighbor of deceased, was permitted to testify as follows:

"49. Tell whether or not, just prior to this killing, you had observed any undue friendship or acts of any sort, existing between Mrs. Crabtree and this defendant?

"A. Well, they seemed when they were together, I never saw them many times together, to be quite friendly, and the first thing I remember was when she would come about my house, or be talking to my wife, that she would use his name considerable."

"The court: Used whose name?"

"A. Mr. Sain's name. She would use his name and didn't use some of the other boarders' names as frequently as she did his."

The foregoing questions and answers were all objected to, and the objections overruled, and exceptions to the ruling of the court taken at the time.

(c). Mrs. Alice Hall, a witness for the Commonwealth, over objection of the defendant, was permitted to testify that about noon, on the day the homicide occurred, she had a conversation with Mrs. Crabtree, which she detailed as follows:

"A. Well, she just called me to the fence and said: 'Mrs. Hall, I am going to leave in the morning,' and I says 'Where are you going?' and she says 'I don't know,' and she was telling me her and her husband didn't

get along, and he had told Mr. Sain to leave that morning, and said that Mr. Sain would have to leave and that Mr. Stone would have to leave, that was her two boarders, and we talked on, I don't remember what all she did say for I never paid much attention to it right then.''

The appellant, while jointly indicted with Mrs. Crabtree, was separately tried. Under these circumstances the declarations of Mrs. Crabtree, not made in the presence or hearing of the appellant, could not be competent evidence against him, and could be nothing more than mere hearsay, in the absence of evidence of the existence of a conspiracy between Mrs. Crabtree and the appellant. The principle upon which it is held that the declarations and acts of one conspirator, preceding its consummation, and not in the presence of the other, are held to be competent evidence against a co-conspirator, is that the conspirators have a common purpose and design, and for that reason that each is an agent of the other in the prosecution of the common design and the consummation of the common purpose. Day v. Com., 173 Ky. 278. The declarations, of course, must be such as are in furtherance of the conspiracy. Hence, in the trial of one for a crime, the declarations of another not made in his hearing nor presence, nor under circumstances which indicate assent thereto upon his part, are clearly incompetent as evidence against the one being tried, until at least a conspiracy to effect the purpose is shown, *prima facie,* to exist. The mere fact that the indictment charges a con·spiracy is not sufficient to eliminate this rule, as a conspiracy might be charged when it had no foundation in fact. The evidence in this case is such that there is not sufficient ground for holding that a conspiracy existed, nor is there any evidence of Mrs. Crabtree aiding or abetting in the homicide, and, hence, the declarations of Mrs. Crabtree, not in the presence nor in the hearing of the appellant, were not competent as evidence against him.

The evidence of Plummer, as to his opinion of what the actions of appellant and Mrs. Crabtree when together indicated, is, also, incompetent, as he probably would draw a different conclusion from what the facts justified. An improper intimacy between the appellant and Mrs. Crabtree could be shown, only, by proving what the facts were, and to leave the jury to draw the conclusion as to what proof of the facts show and the opinion of a witness as to what the facts show could not be competent.

It was competent for the prosecution to prove that an improper relationship and intimacy existed between the appellant and Mrs. Crabtree, as such a fact would be competent evidence to prove a motive upon the part of appellant to murder her husband, and while the existence of an improper intimacy between the appellant and the wife of deceased, could be proven to show the motive upon the part of the appellant for his action in killing the husband, such intimacy would necessarily have to be proven, if at all, by competent evidence. The declarations of the wife, not in the presence of the defendant, could not be heard to prove it, as they, at most, under those circumstances, were mere hearsay.

The introduction of this evidence was, in our opinion, prejudicial to the substantial rights of appellant.

The homicide occurred in the home of deceased, but in a room which the appellant occupied as a boarder, and, where nothing to the contrary being shown, he had a right to come and to be. Nothing could be more calculated to stir the passions of a jury, to the point of ignoring the evidence offered by the appellant in justification of his conduct, than to prove that he had alienated the affections of the wife of the victim, and then to have killed him because he objected; or to have proven that deceased had requested the appellant to remain away from his home, and that appellant, in utter disregard of the rights of deceased to maintain his home without any intrusion of any objectionable person, and without any regard to the rights of the deceased and over his protest, had invaded his house, resulting in the death of the deceased. Such facts, if true, were competent to be proven, but not by mere hearsay.

(d). The judgment would not be reversed for the defect in the instructions complained of, if such defect was the only error, as it scarcely seems that such an error would have been prejudicial, but in the event of another trial, the court should give the following instruction upon the subject of the right of self-defense, instead of the one which it did give, the phraseology of which does not clearly state the law of self-defense: "If the jury shall believe from the evidence that at the time the defendant shot W. S. Crabtree, if he did do so, he in good faith believed and had reasonable grounds to believe, that he was then and there in danger of death, or the infliction of some great bodily harm, at the hands of Crabtree, and there appeared to defendant, in the exercise of a reason-

able judgment, at the time and under the circumstances no other safe means of averting the danger, either real or to him apparent, except to shoot and kill Crabtree, it, the jury will find the defendant not guilty.'' Austen v. Com., 28 K. L. R. 1087.

Having arrived at the conclusions above stated, it is unnecessary to pass upon the third ground relied upon for reversal, and besides we have recently held that such ground is unavailing to reverse a judgment in a criminal trial. McLaughlin v. Com., 192 Ky. 206.

The judgment is therefore reversed and cause remanded for proceedings not inconsistent with this opinion.