## Day v. Commonwealth.

(Decided January 19, 1917.)

### Appeal from Carter Circuit Court.

1. Criminal Law—Motive for Commission of Crime.—Anything, which conduces to show a motive for the commission of a crime, may be proven against one upon trial for such crime, but the proof of a motive, alone, is not sufficient to put one upon his defense.

2. Criminal Law—Principals, Aiders and Abettors.—Where one is charged with committing the acts, which cause the death, and another with being an aider and abettor; if the evidence fails to connect the principal with the crime, the charge against the aider and abettor must fail.

3. Criminal Law—Joint Defendants—Conspiracy.—Where two are jointly indicted for the commission of a crime, upon the separate trial of one, the acts and declarations of the one not on trial, not made in the presence of the one on trial, are not competent evidence against the one on trial, unless it is, prima facie, proven, that

at the time the acts and declarations were made, there was a conspiracy formed between them to commit the crime, and it appears that the acts and declarations were in furtherance of the common design, and the jury should be instructed to what extent and under what circumstances it should consider the acts and declarations of the one not on trial, as evidence against the one on trial. If no consipracy is shown to have existed, the jury should be instructed to disregard the acts and declarations of the joint defendant, not made in the presence of the defendant.

4. Criminal Law—Joint Defendants—Conspiracy.—The acts and declarations of a co-defendant, jointly indicted for a crime with another, may be proven against such other, although not made in his presence, if there is proven, prima facie, a conspiracy to have existed between them to commit the crime, although there is no averment of a conspiracy in the indictment, but the court should instruct the jury as to the extent and under what conditions it should consider the proof of such acts and declarations, as testimony against the defendant on trial, and to reject them as evidence if a conspiracy did not exist at the time they were done and said.

5. Homicide—Instructions.—Where one is charged with murder and the killing is denied, that makes the issue, and the instructions should simply relate to that issue, but if the killing is admitted, and the defense is that it was done in self-defense or by accident, then the instructions should submit such defense.

6. Criminal Law—Instructions.—Instructions should not be given submitting issues which have no foundation in the evidence, as they only tend to confuse.

7. Criminal Law—Credibility—Reputation and Character of Accused.—Where a defendant, in a criminal prosecution, has testified in his own behalf, evidence of his bad character for morality and truth, or either, is admissible in rebuttal, to affect his credibility as a witness, but for no other purpose, and it is not error for the court to fail to admonish the jury as to the purpose for which it may consider such testimony, unless the necessity for it is brought to the attention of the court by objection, exception or motion at the time the evidence is offered or before the case is submitted.

8. Criminal Law—Credibility—Reputation of Accused.—When evidence impeaching the character of a defendant for morality or truthfulness, who has testified as a witness for himself, is introduced, in rebuttal, for the purpose of affecting his credibility, and the attention of the court is called to the necessity of admonishing the jury as to the purpose for which it may consider the evidence as to character, it is the duty of the court to so admonish the jury, but the failure to do so will not be reversible error, unless from the whole record it appears that the defendant's substantial rights have been prejudiced by the failure.

H. L. WOODS and A. J. COUNTS for appellant.

M. M. LOGAN, Attorney General, and D. O. MYATT, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Hurt—Reversing.

The appellant, Sarah Day, a married woman of forty years of age, and who had been married to her husband, James Andrew Day, for nineteen or twenty years, and who had three children, one of whom was married at the time, was, together with one Bob Sparks, jointly, indicted in the Carter circuit court, and charged with the murder of her husband, James Andrew Day, by the administration to him, with the intent to murder him, of arsenic and other poisons, to the grand jury unknown. The indictment charged that appellant and Sparks, jointly, committed the murder by administering arsenic and other poisons, unknown to the grand jury, to the deceased, and it further charged that each of them administered the poison, and that the other was present for the purpose of and aided, assisted, encouraged, incited and abetted the one administering the poison to commit the crime. Separate trials were requested by the accused, and the Commonwealth's Attorney elected to proceed first against the appellant. The trial resulted in a verdict of the jury and a judgment of the court, by which was imposed, upon her, a sentence of imprisonment for life.

Grounds for a new trial were filed, and the appellant moved the court to set aside the verdict of the jury and judgment of the court and to grant her a new trial, but her motion and grounds were overruled.

The grounds upon which a reversal of the judgment is sought are: (1) The admission of incompetent evidence over the objection of the appellant; (2) the court misinstructed the jury; (3) the court failed to instruct the jury upon the whole law of the case; (4) the verdict is contrary to law and not sustained by the evidence; (5) the jury, while trying the case, was taken by the sheriff, in charge of them, to a picture show and there permitted to witness a moving picture, the subject of which was a woman being tried for the murder of her husband.

The facts of the transaction, as developed by the evidence, show that James Andrew Day was about fifty-two or fifty-three years of age, and resided with the appellant and a young son, about thirteen years of age, in the village of Enterprise, in Carter county, which is three or four miles from Olive Hill, at which latter place the married daughter of appellant and deceased lived,

where she is the wife of a merchant. The deceased had been engaged for some time, as a laborer, at a brick yard, near Enterprise, to which he would go each morning and remain during the day, returning to his home in the evening. He regularly took with him from his home, when he was going to work at the brick yard, his dinner, which it is presumed, that the appellant prepared for him.

Several years ago the deceased employed Bob Sparks to work for him for a time, during which he resided at the home of the deceased and thereafter, for a time, boarded at the house of the deceased. Sparks is now a young man about twenty-seven years of age. While being about the home of deceased, Sparks and appellant formed habits of intimacy, which, during the last year of the life of deceased, and probably for a longer period, theretofore, resulted in their frequently committing acts of sexual intercourse, and exhibiting toward each other demonstrations of affection. Witnesses testify to having seen them engaged in embracing and kissing each other, and at one time, they were discovered occupying the same bed, and on other occasions, witnesses testify to having made arrangements between them for meetings at places, where they would be out of the sight of other people. During this time, Sparks resided in the neighborhood and almost every day, at some time during the day, would be at the home of appellant. Sparks and appellant were seen at different times in company with each other upon the railroad trains, and upon one occasion went to Ashland together and remained over night. The appellant, in a small locket, which she sometimes wore, had a picture of Sparks, and certain pictures of his were found in a kitchen safe at her home after the death of deceased. It does not appear that deceased ever made any objections to Spark's intimacy with appellant, or that he knew of it or suspected the truth about it. Sparks was on some occasions at appellant's home when the deceased was present. There does not appear to have been any trouble or estrangement between deceased and appellant on account of Sparks' intimacy with her. In fact, it appears that he was told about it, but persistently refused to believe it or to give any attention to it. The only ill feeling that is proven to have occurred between the appellant and her husband was, that a year

or two before his death a witness testifies that appellant, being much enraged, left the dwelling house and went toward the stable, with the declaration that she was going to secure the axe and kill her husband, applying to him an opprobrious epithet, but, it does not appear what this controversy was about, and it apparently ended in nothing, as they were ever after upon friendly terms, so far as the evidence discloses. It is, also, proven that some months before the death of deceased, he had some whiskey, which he was saving for the purpose of refreshing himself when attending court at Grayson; that his small son and others drank the larger part of it and filled the vessel with water, and as the husband was going toward Grayson, he took a drink out of the vessel and when he discovered its worthlessness, he threw it away and probably accused the appellant of having put the water in it. She, in telling about it, said she did not put the water in it, but if she had an opportunity again, she would put "pizen" in it. Another witness testified that some months before the death of deceased, he came home in the evening with his dinner uneaten and said it smelt like it had been cooked with matches. The appellant, at the time, said that nothing of the kind had occurred and she and the children presently ate the dinner. On another occasion, in the spring or summer before the death of deceased, while he and his family were eating supper, a little niece took a cup off of the table in which to pour coffee for the deceased, when, as she says, she discovered some blue substance in the bottom of the cup and called appellant's attention to it, when appellant told her to get another cup, which she did. It seems that this blue substance was probably blueing, which was used in washing clothing, and appellant so states. There was no circumstance in the evidence which directly proved, that any arsenic or poison of any kind was ever administered to deceased by any one, either intentionally or unintentionally. The case against appellant depended entirely upon circumstances, both as to the cause of the death and the administering of poison by the appellant. Evidence was given by a druggist, who has a place of business in Olive Hill, that on the 29th of December, the appellant purchased ten cents' worth of arsenic, in a powdered form, which she said, at the time, she intended to use for the extermination

of rats. The same witness testified that on the 27th day of January, following, she bought another ten cents' worth of arsenic of the same kind, which she said that she was procuring at the request of a neighbor. The appellant denied the making of these purchases, but stated, that in the fall, previous to the death of deceased, she bought from the same druggist a small quantity of Fowler's solution of arsenic, which is an arsenical preparation, less strong in its action than the powdered form, which she used, according to a prescription, for. her stomach and for her complexion. In this statement she is corroborated by her sister. She, also, testified that about the time the druggist claimed that she purchased one of the quantities of arsenic in powdered form, she purchased from him a vial of white vitriol for a neighbor, who had requested her to buy it for him, and this neighbor corroborated her and testified that she delivered the vitriol to him. It was, also, in evidence that during the months of December and January, the druggist was continually under the influence of intoxicating liquors or some kind of a drug, which gave him the appearance of being in a drunken condition. In the latter part of January or the early half of February, the deceased was sick with a complaint, which the physician, who was called to see him, diagnosed as la grippe. The sickness was attended with vomiting, but lasted only a short time and the physician was called to see him only one time. The deceased continued to work until in the month of July, when he again complained and went to see a physician. On the 26th day of July he became bedridden. A physician visited him at this time and continued his visits each day, with the exception of one, until the 6th day of August, when deceased died. This physician states, that in his opinion the deceased was afflicted with a strong poison of some character operating in his system, and that the symptoms of his sickness were the same, as those exhibited, by subjects of arsenical poisoning. On the 27th day of July, he prescribed and gave him a treatment calculated to eliminate the poison from the patient's body, which, from the evidence of the various physicians, who gave testimony, might be accomplished in from ten to twenty days, but the weight of the evidence tended to show that arsenical poison could not be eliminated within that time. The appel-

lant was present during the sickness of her husband, waiting upon him and administering his medicine in large part to him. Immediately after the death, the coroner, who is, also, a physician, took the stomach, pancreas, liver, one kidney and the spleen, securely enclosed them in jars, and carried them to an expert pathologist, where an examination was made according to the latest methods taught by science to determine the cause of the death, and a chemical analysis was made to determine whether any arsenic or other poison was in the portions of his body above mentioned. This examination developed that there was no arsenic in either the stomach, kidney, liver, spleen or pancreas, 'and the pathologist unreservedly testified, that the death was not due to arsenical poisoning. To defeat the force of the proof by the physicians, to the effect that the deceased did not die from arsenical poisoning, an argument is relied upon, that the arsenic had been eliminated by the treatment before the death, but there is no suggestion of any reason why the deceased did not recover, instead of dying, when the poison had been eliminated. The evidence, also, proved, that all, or quite all, of the symptoms of the sickness of deceased were those of arsenical poisoning, but the proof as strongly shows that all of the symptoms of the sickness of deceased are or may exist in sickness arising from interstitial nephretis, which is one form of Bright's disease, and it was the contention of appellant, that deceased came to his death from the ravages of that disease and not from any poison administered to him. The evidence of the expert, who made the post-mortem, tended to prove that the deceased was suffering at the time of his death from Bright's disease.

(a.) Over the objection of the appellant, the Commonwealth was permitted to prove certain declarations, which were made by Bob Sparks, previous to the death of deceased, but not in the presence of or hearing of the appellant, and without her approval. Henry Carter proved that in the spring before the death of deceased, while at the brick yard, on one occasion, Sparks asked him, "If he (witness) had ever seen his wife." Carter replied, "You have no wife." Sparks took off the back of his watch, wherein appellant's picture was pasted, and said, "That is my wife." At another time Sparks said, that, he thought more of appellant than any one

he ever saw. Witness said to him, "Everything is in shape so you can't marry her."

Thomas Johnson was permitted to state, that about one month before the death of deceased, he and Sparks were working together and he asked Sparks why he was keeping company with appellant, and Sparks answered, "that he loved her and was going to have her if it took death."

Jap Gorby stated that Sparks asked him if he had ever seen his wife's picture and showed him a picture in his watch, which Sparks said was his wife. It was a picture of appellant.

Fred Walker testified, that while deceased was sick, he was at Sparks' home, and as he and Sparks left the house, that Sparks' mother said something about appellant to Sparks, when Sparks cursed his mother, and when they had gotten out in the road, Sparks said, "I wouldn't want none of the Days to fool with me or I would take my pistol and blow their heads off."

The appellant insists that the proof of the foregoing declarations of Sparks was incompetent as evidence against her and very prejudicial to her substantial rights.

The indictment does not charge that any conspiracy existed between appellant and her co-defendant, Sparks, to murder the deceased, or that, in furtherance of such conspiracy, he was killed by them, or by any confederate of either of them. Under the indictment, a conviction of appellant could be sustained in either of the three following states of case: (1) if appellant and Sparks together administered the poison, which produced the death; (2) or if appellant, alone, administered the poison to deceased, which caused his death, either with or without a conspiracy existing between her and Sparks to kill him or with or without the presence of Sparks as aider and abettor; (3) or if Sparks, alone, administered the poison, which killed deceased, and appellant was present for the purpose of and aided and abetted Sparks in so doing. If the indictment had accused Sparks, alone, with having administered the poison, which caused the death, and appellant with having been present and with having aided and abetted him, in so doing, and the conviction of appellant, alone, was sought upon such indictment, it would be competent to prove any act or declaration of Sparks, which

would tend to show his guilt, because, unless it could be shown that he was guilty of the murder, it would be morally impossible for appellant to have aided and abetted him in it. If, under such an indictment, as last named, the evidence had entirely failed to show that Sparks administered the poison and caused the death, the charge against appellant of having aided and abetted him in the murder would necessarily fail. The fact, that, in the instant case, the indictment charges that they jointly and together administered the poison and that each of them, alone, administered it, and the other aided and abetted the one administering the poison in so doing, does not make the situation different, so far as concerns appellant, from the state of case where Sparks is alone, charged with giving the poison and appellant as an aider and abettor of him, when it is sought to show the guilt of appellant, upon the theory that Sparks administered the poison and appellant aided and abetted him. In the record of the trial of appellant, there is not a scintilla of evidence, which tends to prove that Sparks administered any poison to deceased, or even had any poison in his possession or any opportunity to administer it, to the deceased. Neither, does the evidence tend to prove, in the slightest degree, that Sparks and appellant, both being present, together, administered a poison to deceased. Hence, the evidence failing to even conduce to prove that Sparks was present and that he and appellant together administered poison to deceased, or that Sparks, alone, administered the poison, it was impossible for appellant to aid and abet him in so doing. The declarations of Sparks, which were proven, would only conduce to show a motive upon his part to commit the murder and the proof of his relations with appellant does not prove anything more, and the proof of a motive alone is not sufficient to put one upon his defense. 13 R. C. L. 910. Upon the trial of appellant, alone, if evidence had been heard, which conduced to prove that appellant and Sparks together administered the poison to deceased, or that Sparks, alone, administered the poison, which caused the death, and appellant was present and aided and abetted him, the proof of the declarations of Sparks, not made in the presence of appellant, would have been competent, as showing a motive for his acts and that he committed the murder, but in the absence

of a *prima facie* showing, that at the time the declarations were made, that a conspiracy existed between him and appellant to commit the crime, it would have been the duty of the court upon the trial of appellant to have instructed the jury, that it could only consider the declarations of Sparks, not made in the presence of appellant nor approved by her, as evidence conducing to prove Sparks' guilt of the murder, if they tended to do so, and not as evidence against appellant to prove that she was present and that she and Sparks committed the crime together, or that she aided and abetted him, if he alone did it. If, however, upon the trial of appellant, alone, the proof had shown, *prima facie,* independently of the declarations of Sparks, that at the time they were made, there existed a conspiracy between him and appellant to kill the deceased, then the declarations of Sparks, in furtherance of such conspiracy and before its consummation, would be admissible against appellant, although not made in her presence. The reason of this principle rests upon the doctrine of principal and agent. If two or more persons conspire to commit a crime, then the acts and declarations of each of them, in furtherance of the conspiracy and up to the time of its consummation, is the act and declaration of each of the conspirators, as each is regarded in the nature of an agent of the other for the commission of the crime, but in the absence of a conspiracy, there is no just ground upon which it can be contended that one person should be responsible for the acts and declarations of another. Where a conspiracy is proven, *prima facie,* between a defendant, on trial, and one jointly indicted with him for the commission of the crime, and thus, the acts and declarations of the co-defendant, not on trial, made during the existence of the conspiracy and in furtherance of it, are properly admitted as evidence against the defendant on trial, the court should, in substance, instruct the jury, that if it believes from the evidence, beyond a reasonable doubt, a conspiracy was formed between the defendant on trial and the co-defendant, not on trial, to commit the crime, that the acts and declarations of the co-defendant, done and said in furtherance of the common design and before the consummation of it, become the acts and declarations of the defendant on trial; but the converse of this should, also, be given, so that the jury may understand under what circumstances

and to what extent it is to consider the proven acts and declarations of the co-defendant as evidence against the defendant on trial, or whether they should at all be considered.

Where two or more are jointly indicted for the commission of a crime, although there is no express averment of a conspiracy having been formed between them to commit the crime, the acts and declarations of each may be proven against the others, when a *prima facie* case of a conspiracy has been made out between them to commit the crime, if the declarations and acts are in furtherance of the common purpose, although not done nor said in the presence of each other, but the court should instruct the jury in regard to them, as above stated. Howard v. Commonwealth, 70 S. W. 1055; 24 R. 1232; Goins v. State, 21 N. E. 476; Roberson's Criminal Law, sections 105, 109; 5 R. C. L. 1087; Oldham v. Bentley, 6 B. M. 431; Sodusky v. McGee, 7 J. J. M. 266. Where two or more persons are jointly indicted for the commission of a crime, and the evidence fails to show that the ones not on trial were present and assisted in the commission of the crime, or that a conspiracy existed between them and the defendant on trial to commit the crime, then the acts and declarations of the ones not on trial are not competent evidence. Hence, in the instant case, when it appeared that there was a failure of the proof to show that Sparks participated in the commission of the alleged crime, in any way, or that he had conspired with appellant to commit it, the court should have withdrawn and excluded from the consideration of the jury the proof of all of the declarations of Sparks, not made in the presence of appellant, and the failure to do so was prejudicial error.

(b.) The court below instructed the jury, in substance, that if it believed beyond a reasonable doubt appellant administered the poison to deceased, with the intent to kill him and caused his death; or that Sparks administered the poison to deceased, with intent to kill him and appellant was present for the purpose of and aided and abetted Sparks in administering the poison, to find her guilty. For the same reasons heretofore given, the part of the instruction, which authorized the conviction of appellant, if Sparks administered the poison and appellant was present and aided and abetted him, was not authorized. There was no evi-

dence upon which to base such an instruction and an instruction should not be given upon issues which do not exist, as they can only tend to confuse and mislead the jury.

(c.) The contention of appellant, that the court should have instructed the jury, that if it believed that the death of deceased was caused from interstitial nephretis, to find appellant not guilty, is not well taken. The defense in this case was a denial by appellant of having caused the death, and the issue was whether or not the appellant caused the death. It was competent for appellant to prove that the death was caused by disease, to support her denial of having caused it and to rebut the force of any circumstance tending to show that she did do it. Upon the trial of one accused of a felonious homicide, if the killing is denied, that is the only issue, and the instructions should relate simply to that issue, but if the killing is admitted and it is attempted to be avoided by a claim that it was accidental or done in self-defense, then the jury should be instructed along the lines of self-defense or accident, as the case may be. In the instant case, if the administering of the poison to the deceased had been admitted and his death caused thereby, but it was claimed to have been administered accidentally or unwittingly, then the jury should have been instructed along such lines. Hunter v. Commonwealth, 171 Ky. 438; Miniard v. Commonwealth, 158 Ky. 210; Howard v. Commonwealth, 26 R. 465.

(d.) The fact that the jury, while considering the case, was permitted to witness a moving picture show, where the subject was a woman being tried for the murder of her husband need not be considered, as it will probably not occur upon another trial.

(e.) After the appellant had testified as a witness for herself, the Commonwealth's Attorney, in rebuttal, offered proof of the appellant's bad reputation for morality and truthfulness. This evidence was objected to, but the objections were overruled. The evidence was clearly competent for the purpose of impeaching the credibility of the witness, but was not admissible for any other purpose. The court did not admonish the jury that it should be considered for the purpose, only, of affecting the credibility of the appellant as a witness, if it had that effect, and not as evidence conducing to prove her guilt of the crime charged.

The appellant did not request the court to so admonish the jury, but the failure to admonish the jury as to what effect should be given the testimony is relied upon as a reversible error. The court was not called upon or required to give such admonition to the jury, unless at the time of the introduction of the testimony its attention was called to the necessity of such an admonition by objection, exception or motion made by appellant. When its attention was called to the necessity of the admonition, it then was the duty of the court to have given it, but the failure to give the admonition is not reversible error, unless it appears from the whole record, that the substantial rights of the appellant were thereby prejudiced, which question is not necessary to be determined, as the judgment will have to be reversed upon other grounds. Renaker v. Commonwealth, 172 Ky. 714; Hayes v. Commonwealth, 171 Ky. 291; Ochsner v. Commonwealth, 128 Ky. 761; Newman v. Commonwealth, 28 R. 81; Feuston v. Commonwealth, 91 Ky. 230; Johnson v. Commonwealth, 170 Ky. 766; Wright v. Commonwealth, 155 Ky. 750.

(f.) The remaining ground upon which a reversal of the judgment is sought is, that it is not supported by a sufficiency of evidence. In criminal cases, this court has consistently refused to reverse a judgment because of it not being supported by sufficient evidence, unless the verdict is palpably against the evidence. Hall v. Commonwealth, 152 Ky. 812; Wilson v. Commonwealth, 140 Ky. 1; Harmon v. Commonwealth, 140 Ky. 4; Black v. Commonwealth, 154 Ky. 144; Chaney v. Commonwealth, 149 Ky. 464. As the case must be tried again, we do not deem it proper to enter upon any further discussion of the evidence, further than to say, that the inconclusive character of the circumstances shown to prove appellant's guilt, and the apparently satisfactory character of the evidence offered to prove that deceased did not die from arsenical poisoning lead us. to the conclusion that the verdict of the jury is palpably against the evidence and should have been set aside. The wrong done deceased by appellant's unfaithfulness, doubtless tended to stir the passions of the jury against her, but she should not be convicted of murder, unless proven guilty, although guilty of incontinence.

For the reasons indicated the judgment is reversed, and the cause remanded with directions to grant appel-

lant a new trial and for proceedings consistent with this opinion.

Whole court sitting.  Judge Sampson dissenting.