11 So.2d 131

**LANGHAM v. STATE.**

I Div. 160.

Supreme Court of Alabama.

Dec. 23, 1942.

Curtis L. Moody, of Mobile, for appellant.

Wm. N. McQueen, Atty. Gen., and John O. Harris, Asst. Atty. Gen., for the State.

566

BROWN, Justice.

The defendant, appellant here, was convicted of murder in the first degree and sentenced to life imprisonment. The indictment contains four counts, the first charging that the defendant "unlawfully, and with malice aforethought killed William Grover Wilson, *by burning him with fire.*" The second count charges that defendant with like design, intent and purpose killed said Wilson *"by giving him poison";* the third count charges the defendant with like design, intent and purpose killed said Wilson *"by administering to him a quantity of poison,"* and the fourth count charges that the defendant with like design, intent and purpose killed said Wilson *"by administering to him a quantity of poison, to wit; Mercury, a more particular description of which is to the Grand Jury otherwise unknown."*

By demurrer, before pleading thereto, the defendant questioned the sufficiency of each of said counts on the ground that they do not aver with requisite certainty the *means with which the homicide was effected.* The demurrer was overruled and this ruling presents the first question in the case.

■ It is settled law that while the means with which a homicide is effected is not an element of the offense, never the less it is an averment of substance, not of form, and the omission of such averment from a count of the indictment renders it subject to demurrer. Gaines v. State, 146 Ala. 16, 41 So. 865.

■ The fourth count is not subject to this defect and the observation made in Scott's case is here pertinent. Said count "is as nearly analogous to the form prescribed in respect of averring the means by which the homicide was effected as may be, and is therefore sufficient. Code 1896, § 4923, form 63, p. 333. The averment is that the defendant 'did unlawfully and with malice aforethought kill John Scully by administering to him a quantity of *morphine,'* " which, as a matter of common knowledge, is deadly poison. [Italics supplied.] See "Poison," Webster's International Dictionary, p. 1664; Scott v. State, 141 Ala. 1, 37 So. 357, 358.

■ The rule of our cases is that when the drug or substance alleged to have been administered, as a matter of judicial cognizance, is poison, and when administered in sufficient quantity is deadly, it is sufficient to name the drug or substance in the indictment, but if the substance administered is not poison, as a matter of judicial knowledge, the indictment should aver that the substance so administered was "deadly poison, or such as was calculated to destroy human life." Shackleford v. State, 79 Ala. 26; Anthony v. State, 29 Ala. 27; State v. Clarissa, 11 Ala. 57; Nordan v. State, 143 Ala. 13, 39 So. 406; Wilson v. State, ante, p. 1, 8 So.2d 422.

In Nordan's case, supra, the court after criticizing the numerous counts in the indictment in that case, observed, "There is, to say the least, grave doubt of their sufficiency. As the indictment must be quashed for reasons that will be stated later on, and another indictment will have to be preferred, we take occasion here to say that we can see no necessity for multiplying the counts in the indictment, when two would be sufficient to meet any phase of the evidence in the case. For illustration: With proper commencement and conclusion of the indictment as provided in section 4923 of the Criminal Code of 1896, a count charging that the defendant, Walter L. Nordan, unlawfully and with malice aforethought killed Nola Nordan *by administering to her poison, to wit, strychnine;* and a second count, charging that Walter L. Nordan unlawfully and with malice aforethought killed Nola Nordan by causing to be *administered to her poison, to wit, strychnine."* [Italics supplied.] [143 Ala. 13, 39 So. 408.]

This cannot be regarded as a mere idle suggestion, but was incorporated in the opinion as a guide in drawing a sufficient indictment in that case.

■ The means by which the offense was committed not being an essential element of the offense, when such means is unknown to the grand jury, the statute provides, "The indictment may allege that they are unknown to the jury." Code 1940, T. 15, § 242; Duvall v. State, 63 Ala. 12.

In Clarissa's case, supra, it was said, "From this analysis of the statute, it follows, that the indictment should allege, that the substance administered was a deadly poison, or calculated to destroy human life, as it is necessary that every indictment should warrant the judgment rendered upon it. Yet every allegation in this indictment may have been proved, and the life of the persons against whom the supposed attempt to poison was made, never have been in jeopardy; as it cannot be known as

matter of law, that the seed of the Jamestown weed is a deadly poison. The moral guilt, it is true, is as great in the one case as in the other; but that is not the offence which the law intended to punish; but the actual attempt to poison, by means calculated to accomplish it." 11 Ala. 61.

And in Shackleford's case, 79 Ala. at page 28, supra, it was observed, "The better rule, moreover, is for the indictment to specify the name of the poisonous drug used in the attempt, or, if it be unknown to the grand jury, to so allege."

■ The second and third counts of the indictment are defective for failing to name the poison or allege that it was unknown to the grand jury.

Form 79, Code 1940, T. 15, § 259, p. 429, which reduces the averments in indictments for murder to a minimum, is in the following language: "A. B. unlawfully, and with malice aforethought, killed C. D., *by shooting him with a gun or pistol*, etc. *(or by striking him with an iron weight, or by throwing him from the top of a house, or by pushing him into the river, whereby he was drowned, etc.,* as the case may be)." It will be noted that this form in each instance states the quo modo of the use of the instrument causing death. [Italics supplied.]

■ Count one follows in substance this form prescribed, the quo modo being burning with fire which caused Wilson's death.

In Scott v. State, supra, where the indict-ment averred that Scott "unlawfully and with malice aforethought killed John Scully *by administering to him a quantity of morphine*," it was said, "It was not necessary to aver *how* the drug was administered [that is through the mouth or by hypodermic injection], or the particular way in which it affected him, nor that the drug was a poison, or the quantity which was administered. *The administration of a quantity of morphine* is shown by this averment to have been the *means employed to kill*, and that is all that is required." The quo modo there was *the administration of a quantity of morphine,* a deadly poison. See "Poison"—Webster's New International Dic., p. 1664. [Italics and brackets supplied.]

The evidence shows that the defendant is a young man twenty-seven years of age and a blood relation of William Grover Wilson, the person whom he is alleged to have killed, being his second cousin; that

he was subject to the selective draft for the army under the Act of Congress, and *while he had not been called,* he volunteered and was accepted on the 25th of February, 1941, and was sent to Camp Blanding located in the State of Florida. That when defendant was but a boy of seventeen years, living at Loxley, Alabama, where he was born, his said cousin, the deceased, procured a job for him with the bakery company for whom deceased was working at the time and took him into his home where he lived as a member of deceased's family for ten years, and was so living when he *volunteered and enlisted in the army.*

The deceased's family consisted of himself, his wife Laura Wilson, two children, Nell a girl of 17, and "Bubber" 12 at the time of the trial, and the defendant.

Wilson was a man of small means, lived in a rented apartment and supported his family by his earnings from his employment. The defendant, as some of the evidence tends to show, worked and contributed to the support of the family. Wilson, the deceased, and his wife were of the same age, 38 years.

The evidence offered by the state shows that on Sunday afternoon of April 27, 1941, the clothing and bedclothing on the bed in which William Grover Wilson, the person alleged to have been killed, was lying, in some way was ignited with fire and he was severely burned and said burns caused his death on the morning of April 28, 1941.

Some few days after his death and burial the body was exhumed, the vital organs removed therefrom and a toxicological examination made thereof by a competent chemist, and a quantity of mercury found in one of his kidneys and in some of the other organs, which, according to professional opinion of the chemist, would probably have caused his death within two weeks. Some of the other professional witnesses expressed the view that he would not have died on April 28th from the poison. There is no positive evidence that mercurial poison was unlawfully administered to said deceased. The evidence shows that Wilson was in the employ of the Malbis Bakery Company, that he went to Dr. McVay in September, 1940, to obtain a health certificate, and on examination it was disclosed that he was a syphillitic; that Dr. McVay treated him for syphillis, with benzoate of mercury and arsenic, giving him eleven "shots" alternating the mercury and arsenic treatment. That Wil-

son discontinued his visits to McVay for treatment before he was cured, but continued to work for the bread company on his route over Mobile and through parts of Florida and Mississippi; that preparations containing mercury poison for treatment of syphillis could be purchased from drug stores without a prescription from a physician. The evidence further shows that after Wilson stopped going to Dr. McVay for treatment, his mouth became infected and badly inflamed; that in March, 1941, Wilson with his wife Laura Wilson went to Dr. Peterson for examination and treatment and Dr. Peterson diagnosed his trouble as trench mouth and prescribed a mouth wash and sodium amytal, and these prescriptions were filled by pharmacists in drug stores near the Wilson home. The sodium amytal capsules were prescribed to induce sleep. The evidence further shows that an overdose would produce permanent sleep, and eventually heart failure and death.

The evidence further shows that Wilson treated himself with chloroform to ease suffering from the condition of his mouth by saturating a cloth with chloroform and placing it over his nose and mouth; this eased his suffering and induced sleep. The evidence further shows that such use of chloroform was dangerous and was calculated to still the heart, stop respiration and produce death.

Wilson's condition continued to grow worse and Dr. McVay was called into consultation by Dr. Peterson at the residence of the patient, and the evidence shows that Dr. McVay diagnosed the trouble as "Mercurial Stone Tetrus" and the evidence shows that this infection could only be distinguished from "trench mouth" by microscopic examination, and no such examination was made.

Wilson at this time was taking Dr. Peterson's prescription, was drinking quantities of sweet milk, as much some days as five quarts or more. This, as the medical testimony shows, was an antidote for mercury poisoning. The milk and medicines were furnished by Wilson's former employer, Phillip Papas, sales manager for Malbis Bakery.

At the time Wilson consulted Dr. Peterson and sought treatment for his mouth the defendant Langham was in the Army, stationed at Camp Blanding, Florida, something over four hundred miles from Mobile. He came home on leave once just before Easter Sunday, April 13th, and remained for a few days, returning to camp, leaving Mobile on Easter Sunday, and while here on that visit bought a small bottle of chloroform for Wilson, and on one occasion at Wilson's request dampened a cloth and handed it to him.

There is no evidence showing or tending to show that any person at any time administered to Wilson any drug or medicine other than that prescribed by the doctor, and chloroform given to him at his request; and the undisputed evidence shows that Wilson's death was not caused by either chloroform, sodium amytal or mercury. The strong tendencies in the evidence are that Wilson knew he had mercury poison, that caused the inflamed condition of his mouth, and that he was treating himself for this condition by drinking quantities of sweet milk, the antidote for mercurial poisoning.

It is unreasonable and inconsistent to assume that the members of Wilson's family were administering to him mercury with one hand to kill him, and with the other pouring into his system the antidote therefor to counteract the effect of the poison.

■ While proof of motive for a homicide is not an element of the burden of proof resting upon the state, nevertheless evidence going to show motive for an unlawful homicide intentionally committed is admissible in aid of evidence tending to show such intentional killing. Evidence going to show the existence of such motive, standing alone, in the face of the presumption of innocence, does not warrant a submission of the question of guilt or innocence to a jury. McAnally v. State, 74 Ala. 9; Ex parte Grimmett, 228 Ala. 1, 152 So. 263; Day v. Commonwealth of Kentucky, 173 Ky. 269, 191 S.W. 105; State v. Adkins, Mo.Sup., 222 S.W. 431; State v. Ruckman, 253 Mo. 487, 161 So. 705; Underhill's Cr. Ev., 4th Ed., §§ 4 and 559.

■ So far as the last three counts of the indictment are concerned, the state has failed to offer sufficient proof of the corpus delicti,—that is that Wilson's death was caused by poison unlawfully administered to him by another person.

This leaves for consideration the first count charging that the defendant, unlawfully and with malice aforethought, killed said William Grover Wilson "by burning him with fire."

As before stated the state offered evidence that the burns received by Wilson

caused his death. There is an absence of positive testimony as to how the fire originated. It was discovered by Nellie Wilson who heard her father calling or crying out and went to his room. She screamed for help and Young Smith went to the rescue and was engaged in extinguishing the fire on Wilson's clothing, when a neighbor boy, John Edward Balthrop, Jr., who saw the flames through the window, rushed from his front porch into Wilson's apartment and room to aid in extinguishing the fire. This witness testified:

"Between four and four thirty in the afternoon I looked up and I saw a fire in the room right directly in line of vision from my front porch. It was in the second room. I saw a fire there. The first thing that attracted my attention about it was the way it went up. Swish, like that (indicating with his hands upward). I do not know whether I heard it from my house or not, I saw it. It was an unusually high flame, and it looked to me like it was going to the ceiling of the room over there. I went over there immediately. I do not know whether the fire went up right away. The only thing I know when I first noticed the fire it was burning and up, just a big fire. I went over right away from where I was sitting on the end of the little gallery there was about six feet, and I ran down the front steps and straight across our yard to their front steps, and right up their front steps and through the first room into where the fire was. I do not know if there was anyone on the front porch, as I did not stop to see or pay any attention. I did not notice if anyone was in the little room that I entered from the front porch. I continued on back where the fire was. When I first entered the room there were two beds in the room there, and one was just back of the other, and the bed on which the fire was was facing east, and was right up against the window, and that bed was burning in spots. That is the bed where I first saw the fire, near the window opening toward my place.

"The two beds in that room formed a T. and this bed was burning in spots, that is the bed which formed the head of the T. Mr. Wilson was doubled up in a knot, and Ed Smith was over there over him trying to put the fire out when I arrived in the room. There was some sort of a little elevation on the north side of the room, a trunk or a table or something of that sort, and there were some blankets piled up on top of it, and I grabbed one of those blankets and threw it to Ed Smith and told him to wrap Mr. Wilson up in it, and I took one of the blankets myself and smothered the fire on the bed. That is the *bed described as being near the window through which I saw the fire,* and which was burning in spots.

"The spots were burning intermittingly [intermittently], in other words it seemed the blaze was not near as big as when I had seen the fire at first. It looked like whatever had been burning had been consumed and the flame was in its last stages, and when I saw spots on the bed here and here, it seemed as it was just the last part of the flame going out. It looked like what had been burning had been consumed. I do not know *what was consumed.* I did not see any paper, and I did not see any burned paper there. I did not throw the blanket over Mr. Wilson. I used it in putting out the fire on the bed, and Ed Smith was putting out the fire on Mr. Wilson. When the fire had been put out I looked up and the first thing I noticed was in the other room Mrs. Wilson was in the middle of the room and Nell was comforting her, and the first thing I thought about was to get the doctor for the man, and I asked Mrs. Wilson who his doctor was and she said McVay, I think, and Dr. Peterson, so I immediately went back home to the phone and tried to get hold of Dr. McVay, and could not get either one of them. I think one was out and the other could not come so I asked the operator what to do and she gave me the City Hospital, and I told them about it, and they sent an ambulance down there right away.

"And I brought him to the City Hospital. That was on Sunday afternoon April 27th, 1941. This place 1056 S. Washington Avenue is in the City of Mobile, Alabama. I saw Mr. Wilson dead, and know that he was dead afterwards. I do not know exactly when his funeral was held. I do not know Claude Langham, but I know him when I see him. I never saw him at that house before that fire, and I do not remember seeing him after the fire. I do not remember seeing Mrs. Laura Wilson when I first went in there. When I first saw her after the fire was put out she was in the middle of the first room with Nell hovering around her between me and the front porch. I did not see her when I went up there, and this is the first time I saw her that day. I do not know the position of that house, but I think it would be necessary for her to go through the room where I

was to get into the room where she was. I did not see her come through the room where I was. *I have observed fires in which gasoline was used.* * * *

"The witness then continued—The fire looked like it went to the ceiling. It was an ordinary room. I would say ten feet. The bed was two and a half or three feet from the floor. The substance that was feeding the flame did not leave any smouldering *spots in the mattress that I saw.* Whatever was burned was burned out without burning very deep into the bed. I work for the Mobile County Board of Health and have been there a year." [Italics ours.]

On cross examination Mr. Balthrop testified: "The bed was practically out when I went in. It was still smouldering in spots. I did not count the spots. The spots were pretty well all over the bed where they had been burned, but I could not testify as to the exact spot. I put the fire out on the mattress. It looked to me that there was something *on top of the bed that had burned,* and the mattress was still smouldering. I was putting out the fire and did not see Mrs. Wilson come through the room. It is possible for her to have come through the room where I was working. When I first saw Mrs. Wilson she was crying, and Nell had her arms around her mother trying to comfort her. I did not see Mr. Langham there on the day of the fire. * * *"

The witness then continued. "I do not know what it was. Whatever it was that caused that blaze had extinguished. I do not know what caused the blaze. I do not know what it was but it just appeared. I did not see any paper or rags there, neither did I see any wood there. The stuff that burned up did not leave anything, and I did not notice *any odor from it.*" [Italics supplied.]

Willie Jean Barnes testified that she was on the front porch of the Wilson apartment when Nell Wilson screamed and she went immediately to the room where Wilson's clothing and bed were on fire and she did not see any gasoline in the room.

Dr. Newburn, the hospital intern who gave first aid treatment, testified that he discovered no odor on the body except the odor of burnt flesh. The nurse gave similar testimony.

The witnesses testifying as to the burns and the degree of the burns are in accord that the area around the mouth and the end of the nose usually covered by the chloroform cloth used by Wilson to ameliorate the suffering from his mouth was only slightly burned. In the other areas from waist up, the burns were second and third degree burns.

James Leonard Wilson, brother of William Grover Wilson, 25 years of age, testified:

" * * * I bought a quart of gasoline from the City Service Station, which was right across the street in front of the house. My brother's wife told me to buy it, this was Laura Wilson. I carried it to the house, and set it back there on a little porch like. I guess you call it close to the ice box. Nobody told me to put it there. This was Friday morning about seven o'clock and he was burned the following Sunday afterwards.

"I went back to that house after he was burned, and I saw this bottle here. It was a quart milk bottle that I put the gasoline in.

"I went back there Monday morning. If his bed had been sitting where it was when I left it would have been six inches of it, right beside his bed. There was no gasoline *it* [in] it then. I backed into the bottle and turned it over and some poured out on the floor. I do not know how much it was. There was only a small quantity of gasoline remaining in the bottle when I went back there. I do not know what become of the other. * * *." [Brackets supplied.]

Wilson's father testified that he went to the Wilson home on Monday, after Wilson's death at the hospital; that the bed on which Wilson was burned had been moved out of the room, that the milk bottle with a small quantity of gasoline in it was discovered when his son James Leonard accidentally knocked it over and spilled the gasoline on the floor.

Zukerman, the owner of the apartment, testified: "I saw it [account of Wilson's death], in the paper Monday morning and went down there. That was the Monday after it happened on Sunday. I went into the portion that was occupied by Mr. Wilson. I smelled gasoline in there as soon as I opened the door, about nine o'clock." [Brackets supplied.]

There was also evidence going to show that Wilson, the deceased, smoked cigarettes while in bed, that he would smoke about half of a cigarette and put it on a saucer kept on the bed as an ash tray.

■ Whether this evidence is sufficient, prima facie, to establish an unlawful burning of Wilson with fire—the corpus delicti —under count one of the indictment, we need not decide on this appeal. At best it rests in pure inference.

The evidence is without dispute that at the time the gasoline was purchased and the time intervening up until after Wilson's death, the defendant Langham was at Camp Blanding in the State of Florida, over four hundred miles from the place of the tragedy, and there is an absence of evidence showing or tending to show that Langham had any knowledge of the purchase of gasoline, or that there was a conspiracy between Langham and any other person to unlawfully cause Wilson's death.

Langham was not shown to have been present, aiding, abetting or encouraging the killing, if in fact it was an unlawful killing, or that he in any way participated therein. State ex rel. Attorney General v. Tally, Judge, etc., 102 Ala. 25, 15 So. 722.

■ When the person indicted and on trial for homicide is the person physically applying the means causing death, the order in which the evidence is offered is immaterial. If the state fails to offer substantial evidence tending to show an unlawful killing or fails to connect the defendant therewith, he can protect himself by motion to exclude when the state rests the case. Scott v. State, 141 Ala. 1, 37 So. 357; McDowell v. State, 238 Ala. 101, 189 So. 183; Randolph v. State, 100 Ala. 139, 14 So. 792; Taylor v. State, 15 Ala. App. 72, 72 So. 557; Wallace v. State, 16 Ala.App. 85, 75 So. 633.

■ But when the prosecution seeks to hold the defendant on trial as an accessory before the fact, before the acts and declarations of third persons are admissible, the state must show, prima facie, an unlawful killing, and that defendant was present aiding or abetting the unlawful act with knowledge of the killer, or that there was previous concert or confederation between the killer and the defendant on trial. McAnally v. State, 74 Ala. 9; Loper v. State, 205 Ala. 216, 87 So. 92.

■ The last-stated rule was repeatedly violated on the trial of the defendant in this case, but the view we take of the case renders it unnecessary to particularize, therefore we forego further criticism. When the state closed its case, the defendant made a motion to exclude all the evidence, and, as indicated above, was entitled to have the motion granted, and the court erred in overruling it.

For the errors noted, the judgment of the circuit court is reversed.

Reversed and remanded.

All the Justices concur.