TYSON, Judge.
Evelyn Thomas Dutton was indicted for attempted murder in violation of § 13A-4-2, Code of Alabama 1975. She was found “guilty as charged in the indictment” and was sentenced to 25 years in prison. She raises four issues on appeal.
The record reveals that the victim in this case was the appellant’s husband, Jackie Dutton. The appellant and her husband resided near Collinsville, Alabama. During the latter part of April of 1989, they moved in with Jackie Dutton’s mother, Jewel Dut-ton, because they were building a house. She also lived near Collinsville. Jewell Dutton testified that Jackie Dutton became very sick on May 6, 1989. He was vomiting and had severe diarrhea. He went to the hospital emergency room. On May 10, 1989, he was admitted to the Holy Name of Jesus Medical Center in Gadsden. He stayed in the hospital for a week and was released. Jewell Dutton testified that approximately two days after he was released from the hospital, he became ill again with severe vomiting and diarrhea. He was readmitted to the hospital. He suffered a cardiac arrest at the hospital the following day. A few days later, he was flown to the University of Alabama at Birmingham Hospital (hereinafter UAB Hospital) and placed in the cardiac intensive care unit. Jewell Dutton testified that her son was allowed to have visitors for ten minutes every two hours while he was in the cardiac intensive care unit. She stated that the appellant went alone to visit Jackie Dutton on several occasions. She further testified that the appellant called her in August 1989 and stated that she did not mean to kill Jackie. She testified that the appellant told her that she wanted to “give him enough” to make him sick so that he would not find out about some missing money (R.383.)
The victim, Jackie Dutton, testified that he became ill in the spring of 1989 with a burning stomach and diarrhea. He became sick again after he returned from his first stay in the hospital. He was admitted to the hospital the second time with the same symptoms. He testified that sometime after being admitted to UAB Hospital he was moved to a private room with unrestricted visitation. He was visited by his mother, his brothers and sisters, and the appellant. He further testified that the appellant fed him during this time. He was in the private room for approximately a day and a half. He remained at UAB Hospital until the end of June. The record reveals that after leaving UAB Hospital he was admitted to Spain Rehabilitation Center in Birmingham.
Dr. Vance Plumb, a cardiologist at UAB Hospital, testified that Jackie Dutton was critically ill when he was transferred to UAB Hospital. He testified that the victim’s cardiac arrest was caused by a heart rhythm disturbance. He was also suffering from weakness, anemia, nausea, vomiting, and diarrhea. After approximately one week, the victim’s heart rhythm appeared to stabilize, and he was moved to a private room. Approximately 24 to 48 hours after being moved, he suffered another cardiac arrest. He was moved back to intensive care. The victim now had abnormal weakness and was suffering from neuropathy. He was virtually paralyzed and could not raise his arm above his head or support his weight with his legs.
Dr. Plumb testified that after the second cardiac arrest, he received test results which indicated that the victim’s illness was caused by arsenic poisoning. He testified that the victim’s arsenic levels were “astronomical.” He further testified that the “very high level suggested to us or I believe was absolute evidence that there had been a recent massive ingestion of arsenic by Jackie Dutton.” (R. 123.) He testified that it was his conclusion that Jackie Dutton received a very large dose of arsenic after he was moved out of the cardiac intensive care unit.
After receiving the test results, Dr. Plumb restricted access to the victim and told him not to ingest anything that was not given to him by medical personnel. Dr. Plumb testified that arsenic is a poison which causes intense nausea, vomiting, di *1049 arrhea, and neuropathy resulting in weakness of the skeletal muscle. He testified that arsenic may also cause unstable heart rhythm and cardiac arrest.
Dr. Plumb testified that the appellant had frequently been alone with the victim after he was moved from intensive care. He further testified that the appellant was the only one in the room with the victim when he suffered the cardiac arrest in the private room. He further testified that the victim was not tested for exposure to orga-nophosphate while he was at UAB Hospital.
Joe Nabors, an investigator with the Alabama Bureau of Investigation, investigated the incident. He spoke to the appellant at Prewitt Mill in Fort Payne, Alabama. They spoke in his car. The appellant told Nabors that she had purchased Ortho fire ant killer that summer. She further stated that she might have poisoned her husband, but if she did, she did not remember. She stated that if she did poison him, it was an accident.
The appellant went to the Gadsden Police Department on July 29, 1989. The appellant told Nabors that the first time Jackie Dutton was poisoned was during the summer when he ate cereal out of a bowl she had used to poison fire ants. Nabors testified that when he asked her if she told her husband about the poison when she saw him eating from the bowl, she smiled and answered “no.” The appellant also stated that she put fire ant poison in Jackie Dut-ton’s food at Spain Rehabilitation Center. She stated that she brought the poison to the hospital in a baby food jar and put it in his food when he was taken out of the room for tests. Nabors testified that the appellant told him the poison mixed easily with his food and that she smiled as she told him that. The record reveals that the baby food jar was removed from the appellant’s residence during an earlier search.
On cross-examination, Nabors testified that his investigation revealed that the victim became ill with vomiting and diarrhea on April 10, 1989. The victim’s children, mother, and brother also became ill at that time. The victim was admitted to the hospital in Gadsden on May 10, 1989, with vomiting and diarrhea. He was discharged on May 17, 1989, but was re-admitted on May 19, 1989 with the same symptoms. He was transferred to UAB Hospital on May 24, 1989. He testified that the appellant stated that she had poisoned Jackie Dutton two or three days after he was moved out of the cardiac intensive care unit. He further testified the victim stated that both his mother and the appellant fed him after he was moved out of intensive care. He further testified on cross-examination that the victim told him that the appellant had purchased Androl to kill fire ants. Nabors testified that Androl has a high level of arsenic in it. He further testified that none of the items seized from searches of the appellant’s residence and Jewell Dutton’s residence were found to contain arsenic.
Dr. Joerg Pirll was the head of the toxicology section for the Alabama Department of Forensic Sciences in Birmingham at the time of the investigation. He analyzed hair samples taken from the victim. He testified that the victim’s first exposure to arsenic was on January 3, 1989. He further testified that there was a rapid increase in the victim’s arsenic level from April 3, 1989, until June 3, 1989, with the highest concentration of arsenic occurring on June 3. He testified that the high concentration of arsenic on June 3 meant that the arsenic had been ingested on approximately May 29, 1989. The victim’s arsenic concentration dropped dramatically on June 6, 1989. Dr. Pirll stated that all of the dates as to which he testified had a margin of error of plus or minus nine days.
Dr. Pirll testified that arsenic is a poison most commonly used in ant control. He testified that low level exposure causes gastrointestinal upset, stomach cramps, diarrhea, and severe headaches. He testified that long-term exposure caused neuropathy and other neurological symptoms. He testified that none of the items taken from the appellant’s residence or from Jewell Dut-ton’s residence contained arsenic. He testified that the white powder in the baby food jar was acephate. He testified that a can *1050 of Orthene taken from the appellant’s residence also contained the same substance. He further testified that acephate is an organophosphate commonly use in insecticides. Dr. Pirll stated that acephate is poisonous. He further testified that ingestion of acephate causes salivation, urination, and diarrhea, which is rapidly followed by a shut down of the nervous system. Dr. Pirll stated that ingestion of acephate causes paralysis and loss of muscle control. He also testified that acephate metabolizes very quickly and is difficult to detect after ingestion.
The appellant testified that she bought fire ant poison the summer before her husband became sick. She stated that she told Nabors she may have poisoned her husband because Jackie told her that nothing would happen to her if she confessed. She admitted making the statements to Nabors about poisoning her husband, but she denied the truth of the statements. She testified that she made the statements because Jackie told her that everything would be dropped if she confessed. She further testified that she never had arsenic, had never seen arsenic, and had never given her husband arsenic. She further testified that she fed her husband while he was in the hospital, but that every time she fed him someone else was in the room with them.
I
The appellant contends that Jefferson County, where UAB Hospital is located, was not the proper venue for her trial but that proper venue was in DeKalb County, where the appellant and Jackie resided because the evidence indicated that the poisoning began in January 1989. She argues that the evidence was insufficient to support a finding that the crime occurred in Jefferson County. We disagree.
In order to preserve the issue of improper venue, a specific objection must be made before a verdict is reached. Kelley v. State, 568 So.2d 405 (Ala.Crim.App.1990). Our reading of the objections made by the appellant at trial leads us to the conclusion that the appellant did not specifically raise this issue at the trial level and, thus, did not preserve this issue for review. See, e.g., Crowell v. State, 389 So.2d 545 (Ala.Crim.App.1980). Even if the appellant had properly preserved this issue, there was no error because there was ample evidence of proper venue.
When evidence has a tendency to prove that the offense was committed within the jurisdiction of the court trying the case, venue is a question of fact for the jury. Creech v. State, 508 So.2d 302 (Ala.Crim.App.1987); Kirby v. State, 500 So.2d 79 (Ala.Crim.App.1986).
“In a criminal case, proof of venue is sufficient if it can be reasonably inferred by the jury from the facts and circumstances adduced. Venue need not be established solely by direct evidence. Evidence from which it is inferrible is sufficient. Venue may be established by the testimony of one witness.”
Coleman v. State, 423 So.2d 276, 279 (Ala.Crim.App.1982) (citations omitted). See also Griggers v. State, 560 So.2d 1098 (Ala.Crim.App.1989); Segars v. State, 409 So.2d 1003 (Ala.Crim.App.1982).
Dr. Plumb testified that Jackie Dut-ton received a large dose of arsenic at UAB Hospital after he was moved from cardiac intensive care to a private room. He further testified that the appellant had been alone with the victim while he was in the private room. He testified that the appellant and the victim were frequently alone together. The appellant stated that she fed her husband fire ant killer two or three days after he was moved from intensive care. Dr. Pirll testified that the victim’s maximum arsenic concentration occurred on June 3, 1989. He testified that acephate was also a poison. His testimony indicated that the symptoms of arsenic and acephate poison were similar. The contents of the baby food jar taken from the appellant’s residence contained acephate. There was also testimony that the appellant had purchased Androl, a fire ant killer containing a high level of arsenic. The evidence was sufficient to prove that the appellant was poisoned in Jefferson County with both acephate and arsenic. See, e.g., Creech.
*1051 II
The appellant next contends that the indictment was due to be dismissed because it did not properly charge the means by which she attempted to murder her husband. The indictment charged the appellant with attempting to intentionally cause the death of Jackie Dutton “by putting poison in his food.” (R. 790.)
The appellant failed to preserve this issue for review. The appellant failed to object to the indictment prior to her plea of not guilty. “Generally, a defendant’s entry of a plea to the merits of an indictment constitutes a waiver of all defects in the indictment unless the indictment was so defective it left the defendant unaware of the nature and course of the charge against him.” Hambley v. State, 565 So.2d 692, 693 (Ala.Crim.App.1990). See also Chappell v. State, 470 So.2d 1371 (Ala.Crim.App.1985); Wyatt v. State, 419 So.2d 277 (Ala.Crim.App.1982) (objection to sufficiency of accusation in indictment untimely because it was made after jury was empaneled); Gentry v. State, 344 So.2d 1246 (Ala.Crim.App.), cert. denied, 344 So.2d 1249 (Ala.1977). “[A]n averment of means, although one of substance and not form, is not a constituent or essential element of the offense. The omission of such would render an indictment merely voidable rather than void.” Harrison v. State, 384 So.2d 641, 643 (Ala.Crim.App.1980). In Howard v. State, 420 So.2d 828 (Ala.Crim.App.1982), this court held that the failure to aver the means in an attempted murder indictment did not render the indictment void. This court then held that the appellant’s demurrer to the indictment was untimely filed because it was filed after the appellant pleaded not guilty. Id. This issue was likewise not preserved for review in the case now before this court.
We also find that the indictment did not leave the appellant unaware of the nature of the charge against her. Other than failing to name a specific poison,[1] the indictment alleged the means by which the appellant attempted to murder her husband. There is no requirement that an indictment set up the proof necessary to sustain a conviction. Copeland v. State, 456 So.2d 1150 (Ala.Crim.App.1984). The record also indicates that the appellant was fully prepared and presented a thorough defense.
III
The appellant contends that the evidence is insufficient to sustain the conviction. We disagree.
“A person is guilty of an attempt to commit a crime if, with the intent to commit the specific offense, he does any overt act towards the commission of such offense.” Ala.Code § 13A-4-2(a) (1975). “A person commits the crime of murder if, with the intent to cause the death of another person, he causes the death of that person or another person.” Ala.Code § 13A-6-2(a)(1) (1975).
We find that there was sufficient evidence to support the conviction. The appellant admitted that she fed her husband ant poison at the hospital two or three days after he was moved from the cardiac intensive care unit. Although she referred to Spain Rehabilitation Center in one of her statements, the jury could have reasonably found that she poisoned him at UAB Hospital. The Ortho fire ant killer the appellant claimed to have used contained acephate, which is a dangerous poison. There was also evidence that the victim was poisoned with arsenic. There was testimony that the appellant purchased Androl, an ant killer which contains arsenic. Dr. Plumb testified that the victim ingested a large amount of arsenic after he was moved to a private room. The appellant stated that this was the same time period during which she fed her husband ant killer. The symp *1052 toms of arsenic and acephate poisoning are substantially the same. Dr. Pirll testified that both poisons are commonly used in insecticides.
The accused’s intent at the time of an alleged crime is often not provable by direct or scientific proof. Thus, “[i]ntent may be inferred from the use of a deadly weapon, the character of the assault, or other attendant circumstances.” DeRamus v. State, 565 So.2d 1167, 1171 (Ala.Crim.App.1990). See also Paige v. State, 494 So.2d 795 (Ala.Crim.App.1986). The appellant testified that she was aware that ant poison was dangerous to the human body. She told the police that she put ant poison in her husband’s food. She fed it to him while he was seriously ill and in a weakened condition. The jury could have reasonably found the existence of both the overt act and the required intent.
“A conviction will not be set aside on the basis of insufficiency unless ‘allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust.’ ” DeRamus at 1171-72 (quoting Johnson v. State, 378 So.2d 1164, 1169 (Ala.Crim.App.), cert. quashed, 378 So.2d 1173 (Ala.1979)). The evidence presented by the State, along with the reasonable inferences to be drawn from it, is sufficient to sustain the conviction.
IV
The appellant finally contends that the trial court erred in admitting the statements she made at the Gadsden Police Department. This argument has no merit. Investigator Nabors testified that the appellant was given her Miranda warnings prior to signing a waiver. She also initialed each of the specific rights. Nabors further testified that the appellant was not threatened, coerced, induced, or promised a hope of reward. He testified that there was no indication that the appellant did not understand her rights. He further testified that neither he nor the other officer present during the statement raised his voice. At the hearing on the motion to suppress, the appellant testified, “I was telling them willingly what I was telling them.” (R. 48.) The appellant also testified that she was told she could make things easier on herself by cooperating. She testified that the officers yelled at her. She testified at trial that she made the statements because her husband told her the case would be dropped if she confessed.
“The question of whether a confession was voluntary is initially to be determined by the trial court. Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Even where there is credible evidence to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and volun-tariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. The trial court need only be convinced from a preponderance of the evidence to find a confession has been voluntarily made.”
Jackson v. State, 562 So.2d 1373, 1381 (Ala.Crim.App.1990) (citations omitted). See also Adkison v. State, 548 So.2d 606 (Ala.Crim.App.1988). We find that the record supports the trial court’s finding of voluntariness and that the statements were properly admitted.
We note that the appellant also refers in brief to the statements made by the appellant to Investigator Nabors when he questioned her in his car in front of her place of employment several days prior to her arrest. We have carefully reviewed the record as to the circumstances surrounding these statements and find that these statements were not made during a custodial interrogation which would have required Miranda warnings. See, e.g., Banks v. State, 570 So.2d 1282 (Ala.Crim.App.1990); P.S. v. State, 565 So.2d 1209 (Ala.Crim.App.1990). Furthermore, there was evidence in the record that the appel *1053 lant was given Miranda warnings prior to making the statements. Thus, these statements were also properly admitted into evidence.
For the reasons set forth above, this case is due to be, and it hereby is, affirmed.
AFFIRMED.
All the Judges concur.

. We note that in Langham v. State, 243 Ala. 564, 11 So.2d 131 (1942), the Alabama Supreme Court held that a murder indictment was subject to demurrer because it did not name the poison used in the charged murder or allege that it was unknown to the grand jury. See generally Ala.Code § 15-8-26 (1975). The name of the poison went to the means, however, and was subject to demurrer. The court did not hold that the failure to name the poison voided the indictment.